JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jane Doe L.S., a pseudonym | City of Philadelphia, et al. |

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Joshua Van Naarden, Esquire/215-960-0000
VSCP Law, 2001 Market St., Ste 3700, Phila, PA 19103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1331, 1343, 1367 and 1391(b); 42 USC 1983

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____ DOCKET NUMBER _____

DATE
1/27/2023

SIGNATURE OF ATTORNEY OF RECORD
*Joshua Van Naarden*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ c/o VSCP Law, 2001 Market Street, Suite 3700, Philadelphia, PA 19103 _____

Address of Defendant: _____ 1515 Arch Street, #15, Philadelphia, PA 19102 _____

Place of Accident, Incident or Transaction: _____ Philadelphia County _____

---

**RELATED CASE, IF ANY:**

Case Number: __220900803 - Philadelphia County__   Judge: _____ Linda Carpenter _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☒ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☒ | No ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☒ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☒ |

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __1/27/2023__   *Joshua Van Naarden*   __86740__
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☒ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Joshua Van Naarden__, counsel of record *or* pro se plaintiff, do hereby certify:

- ☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: __1/27/2023__   *Joshua Van Naarden*   __86740__
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| **JANE DOE, L.S., a pseudonym** | : |
| | : |
| **v.** | : **NO. 23-** |
| | : |
| **CITY OF PHILADELPHIA, JOHN DOE** | : |
| **SUPERVISORS 1-5, DETECTIVE DONALD** | : |
| **SUCHINSKY, JIM DOE DETECTIVE and** | : |
| **JEN DOE DETECTIVE** | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See §1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS**:

(a)    Habeas Corpus - Cases brought under 28 U.S.C. §2241 through §2255.    (    )

(b)    Social Security - Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    (    )

(c)    Arbitration - Cases required to be designated for arbitration under Local Civil Rule 53.2.    (    )

(d)    Asbestos - Cases involving claims for personal injury or property damage from exposure to asbestos.    (    )

(e)    Special Management - Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    (    )

(f)    Standard Management - Cases that do not fall into any one of the other tracks.    (  X  )

| | | |
|---|---|---|
| 01/27/2023 | Joshua Van Naarden, Esquire | Plaintiff |
| Date | Attorney-at-Law | Attorney for |
| 215-960-0000 | 215-960-0384 | jvannaarden@vscplaw.com |
| Telephone | Fax Number | E-Mail Address |

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)      The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)      In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)      The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)      Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)      Nothing in this Plan is intended to supersede Local Civil Rules 3 or 7, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02(e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may requires special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class act ions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE, L.S., a pseudonym,**<br>c/o VSCP LAW<br>Two Commerce Square<br>2001 Market Street, Suite 3700<br>Philadelphia, PA 19103<br><br>               Plaintiff,<br><br>    v.<br><br>**CITY OF PHILADELPHIA**<br>c/o City of Philadelphia Law Department<br>1515 Arch Street #15<br>Philadelphia, PA 19102<br>     and<br>**JOHN DOE SUPERVISORS 1-5**<br>c/o City of Philadelphia Law Department<br>1515 Arch Street #15<br>Philadelphia, PA 19102<br>     and<br>**DETECTIVE DONALD SUCHINSKY**<br>18 Lacey Street<br>Hatboro, PA 19040<br>     and<br>**JIM DOE DETECTIVE**<br>c/o City of Philadelphia Law Department<br>1515 Arch Street #15<br>Philadelphia, PA 19102<br>     and<br>**JEN DOE DETECTIVE**<br>c/o City of Philadelphia Law Department<br>1515 Arch Street #15<br>Philadelphia, PA 19102<br><br>               Defendants. | **CASE NO.:**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, Jane Doe, L.S. ("Jane Doe"), by and through her undersigned counsel, VSCP

LAW, now files this Complaint against Defendants, City of Philadelphia, Jim Doe Detective, Jen

Doe Detective, John Doe Supervisors 1-5 and Donald Suchinsky, seeking all damages recoverable under Pennsylvania law.  In support of this action, Plaintiff avers as follows:

## PARTIES

1.      **PLAINTIFF, JANE DOE L.S.,** is an adult individual who was groomed, sexually assaulted, and repeatedly sexually harassed by Defendant, Donald Suchinsky, after the City of Philadelphia Police Department appointed him as the lead homicide detective investigating the murder of her son. Jane Doe L.S. is a pseudonym for Plaintiff in this case, and her name and address are not contained in this Complaint to protect her identity and privacy given the sensitive nature of the injuries and damages she sustained as described herein.  Plaintiff may be contacted through her undersigned counsel.

2.      **DEFENDANT, CITY OF PHILADELPHIA ("City")**, at all times relevant to this Complaint, is/was a municipality located in the Commonwealth of Pennsylvania.  The City was, at all times material to this Complaint, acting under color of law and officially responsible for the policies, practices, and customs of the City of Philadelphia Police Department ("PPD"). At all times relevant hereto, the City employed and controlled commissioners, majors, captains, lieutenants, sergeants, ranking officers, detectives, current or former PPD administrators, investigators, supervisors, staff and other officers and agents in the police department, and the Homicide Division more specifically. The City, as an institution through established policies, procedures, and customs at the PPD, and through supervisory agents like John Doe Supervisors 1-10 who worked for the PPD and were responsible for managing and overseeing criminal investigations, the use of police officer facilities, and the constitutional exercise of police power and authority during investigations into investigate crimes like the murder of Plaintiff's son. As

2

explained below, the City is jointly and severally liable with codefendants for Plaintiff's injuries and damages.

3.     **DEFENDANTS, JOHN DOE SUPERVISORS 1-5,** are current or former administrators, commissioners, deputies, majors, lieutenants, as well as other police officers (both of rank and their subordinates), detectives, investigators, or other personnel similarly situated as supervisory staff, or agents of the PPD, whose identities are not yet known to undersigned counsel, but who at all relevant times were employed by the PPD or were under the control of the City and/or PPD, worked at the City and/or PPD as executive decision-makers, and were duty-bound and responsible for, *inter alia*: the promulgation, adoption, oversight, implementation, and/or enforcement of rules and regulations applicable to the management of the PPD's affairs; hiring, retaining, supervising, instructing, training, counseling, and administering discipline to employees like Detective Suchinsky for misconduct; vetting the qualifications and record of PPD detectives; monitoring the actions of detectives in furtherance of investigations (including their interactions with victims, witnesses and/or interviewees); reporting unconstitutional activity or acts of police misconduct (sexual or otherwise); monitoring the use of PPD facilities (e.g., the officer-only parking lot, official government email addresses, PPD phone lines); maintaining records of police misconduct (sexual or otherwise); and properly investigating and responding to acts of police misconduct (sexual or otherwise). The names and/or identities of John Doe Supervisors 1-5, whose acts and/or omissions directly contributed to the injuries and damages suffered by Plaintiff as set forth below, are currently unknown to undersigned counsel, readily identifiable by Defendants and/or in the sole possession of Defendants and/or their counsel, and will be identified and substituted after they are discerned through reasonable discovery.

4.      The City and John Doe Supervisors 1-5 shall herein be collectively referred to as "the Supervising Defendants."

5.      **DEFENDANT, DONALD SUCHINSKY ("Detective Suchinsky")**, is an adult individual residing at 18 Lacey Street, Hatboro, PA 19040. At all times relevant to this Complaint, was an officer employed by the PPD (Badge No. 9128) and acting under color of law as a Detective within the PPD Homicide Unit within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, training, and usage by the City and its police department.   Upon information and belief, Detective Suchinsky was assigned as the Lead Homicide Detective to investigate the murder of Plaintiff, Jane Doe's son, and in the course of said investigation, groomed, sexually assaulted, and repeatedly harassed Plaintiff, as described more particularly herein. Detective Suchinsky is being sued in his individual capacity, and is jointly and severally liable with codefendants for Plaintiff's injuries and damages as explained in greater detail below.

6.      **DEFENDANT, JIM DOE DETECTIVE,** at all times relevant to this Complaint, was a police officer and/or detective employed by the PPD (Badge No. TBD) and acting under color of law within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, training, and usage by the City and its police department.   Upon information and belief, Jim Doe Detective was Detective Donald Suchinsky's partner, colleague, co-worker, or otherwise assisted him in the investigation of the murder of Plaintiff, Jane Doe's son, and in the course of said investigation, demonstrated a deliberate indifference to the obvious warning signs and indications that Detective Suchinsky was engaging in sexual misconduct directed to Plaintiff, as described more particularly herein, but purposefully and consciously failed to report his misconduct to the City and/or John Doe Supervisors 1-5, or otherwise take action to

protect Plaintiff's constitutional right to be free from Detective Suchinsky's advances. The names and/or identities of Jim Doe Detective, whose acts and/or omissions directly contributed to the injuries and damages suffered by Plaintiff as set forth below, are currently unknown to undersigned counsel, readily identifiable by Defendants and/or in the sole possession of Defendants and/or their counsel, and will be identified and substituted after they are discerned through reasonable discovery.  Detective Jim Doe Detective is being sued in his individual capacity, and is jointly and severally liable with codefendants for Plaintiff's injuries and damages as explained herein.

7.      **DEFENDANT, JEN DOE DETECTIVE,** at all times relevant to this Complaint, was a police officer and/or detective employed by the PPD (Badge No. TBD) and acting under color of law within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, training, and usage by the City and its police department.  Upon information and belief, Jen Doe Detective was Detective Donald Suchinsky's partner, colleague, co-worker, or otherwise assisted him in the investigation of the murder of Plaintiff, Jane Doe's son, and in the course of said investigation, demonstrated a deliberate indifference to the obvious warning signs and indications that Detective Suchinsky was engaging in sexual misconduct directed to Plaintiff, as described more particularly herein, but purposefully and consciously failed to report his misconduct to the City and/or John Doe Supervisors 1-5, or otherwise take action to protect Plaintiff's constitutional right to be free from Detective Suchinsky's advances. The names and/or identities of Jen Doe Detective, whose acts and/or omissions directly contributed to the injuries and damages suffered by Plaintiff as set forth below, are currently unknown to undersigned counsel, readily identifiable by Defendants and/or in the sole possession of Defendants and/or their counsel, and will be identified and substituted after they are discerned through reasonable

discovery. Detective Jen Doe Detective is being sued in his individual capacity, and is jointly and severally liable with codefendants for Plaintiff's injuries and damages as explained herein.

## JURISDICTION

8.      Pursuant to 28 U.S.C. §§1331 and 1343, *et seq.*, this Honorable Court has Federal Question jurisdiction over Plaintiff's federal civil rights claims under 42 U.S.C. §1983.

9.      Pursuant to 28 U.S.C. §1367, this Court also has supplemental jurisdiction over the Plaintiff's state law battery and assault claims because they are directly related to Plaintiff's Section 1983 claims.

10.     Pursuant to 28 U.S.C. §1391(b), venue properly lies before this Court because the cause of action upon which the complaint is based arose in Philadelphia County, Pennsylvania, which is situated within the vicinage of the United States District Court for the Eastern District of Pennsylvania.

## OPERATIVE FACTS

11.     The preceding paragraphs of this Complaint are incorporated by reference herein.

12.     This case is about the institutional failure of the City, acting under color of law through the PPD and its supervising and/or ranking officers, to train and oversee the conduct of Detective Suchinsky who, rather than focus on the task of investigating the homicide of Plaintiff's son, focused his efforts on exploiting his position of power and authority over the course of many months as he sexually assaulted and repeatedly harassed Plaintiff, Jane Doe, during the most vulnerable and tragic time of her life.

13.     On information and belief, Detective Suchinsky had a history of sexual misconduct and/or otherwise abusing his position of power and authority with respect to his interactions with witnesses and other persons involved in past PPD investigations.

6

14.     On information and belief, the Supervising Defendants knew of and/or were deliberately indifferent toward Detective Suchinsky's conduct directed to Plaintiff despite his previous abuse and exploitation his position of authority and power as a detective in the PPD's glorified Homicide Unit leading investigations (including the investigation into the murder of Plaintiff, Jane Doe's son).

15.     On information and belief, the Supervising Defendants were actually aware, or willfully blind to, the risk and occurrence of sexual misconduct by Detective Suchinsky in this case, i.e., grooming, sexually abusing and harassing Plaintiff, Jane Doe.

16.     Despite their knowledge of his past misconduct, the Supervising Defendants recklessly and with deliberate indifference to the rights of individuals with whom Detective Suchinsky came into contact, took no actions to appropriately respond, report, or discipline Detective Suchinsky.  These failures enabled and empowered him to groom and sexually assault and harass Plaintiff, Jane Doe, causing her to sustain tremendous injuries and damages as set forth herein.

17.     On the evening of November 2, 2020, Plaintiff Jane Doe's adult son was shot and killed in North Philadelphia.

18.     Detective Suchinsky's fellow detective, a female officer of the PPD ("Jen Doe Detective") was present at Temple University Hospital for the death notification when Jane Doe's son was pronounced dead.

19.     The PPD opened a homicide investigation into the murder of Jane Doe's son, and assigned Detective Suchinsky to the case.

20.     On November 3, 2020, Plaintiff Jane Doe met Detective Suchinsky for the first time at her mother's house.

21.    Jane Doe's mother and sister were present for this initial interaction between Detective Suchinsky and Jane Doe.

22.    Detective Suchinsky's partner and fellow PPD detective, an African American male officer ("Jim Doe Detective"), whose identity is presently unknown to Plaintiff or undersigned counsel, was also present for the first interaction between Suchinsky and Jane Doe.

23.    During their first interaction, Detective Suchinsky walked across the street with Jane Doe to show her the crime scene.

24.    At the conclusion of Detective Suchinsky's initial meeting with Jane Doe and her family, he gave her his business card, hugged her, and asked if she would email him any relevant information, including potential leads or suspects, to his official "phila.gov" email address.

25.    Detective Suchinsky also asked Jane Doe to provide an interview at the Homicide Unit, which was located at the 750 Race Street, in the Chinatown neighborhood of Philadelphia, across from Franklin Square ("PPD Headquarters").

26.    Between their first interaction and the first interview, Detective Suchinsky called Jane Doe from an official PPD office phone line, and told her there were "things" he wanted to do to her, but he could not say what they were.

27.    Within approximately one week of her son's murder, Jane Doe went to the PPD and provided her first interview, which was conducted by Detective Suchinsky in the presence of Jim Doe Detective.

28.    At the conclusion of Jane Doe's first interview, Detective Suchinsky asked her to take a "selfie" and send to him personally.  As explained below, he repeatedly asked Jane Doe to send him pictures of herself numerous times in the months that ensued.

29.     Even though Detective Suchinsky's request for a "selfie" of Jane Doe had absolutely nothing to do with advancing the homicide investigation, Jim Doe Detective did not disavow, report, or otherwise express any disapproval regarding Detective Suchinsky's request for a selfie to be sent directly and only sent to Detective Suchinsky.

30.     Jim Doe Detective knew and/or was deliberately indifferent toward Detective Suchinsky's inappropriate solicitation of Jane Doe's picture for his personal use.

31.     On information and belief, Jim Doe Detective decided not to disavow, report, or otherwise express any disapproval regarding Detective Suchinsky's request for a selfie from Jane Doe because doing so would be contrary to the culture of silence and retaliation within the PPD for filing internal reports against other officers for misconduct.

32.     Because Jim Doe Detective did not disavow, report, or express any disapproval of his partner's request for a selfie from Jane Doe, Detective Suchinsky escalated his attempts to court, flirt with, and harass Jane Doe while he was investigating her son's murder.

33.     On November 10, 2020, Detective Suchinsky wrote an email following up on his prior request: **"SEND ME A PIC OF YOU."**

34.     In order to appease Detective Suchinsky and get him to leave her alone, Jane Doe hesitantly sent a recent picture of herself.

35.     Detective Suchinsky continued to harass Jane Doe, though.

36.     On November 11, 2020, at 2:40 p.m., after Jane Doe tried to change the subject of another improper email conversation back to her personal efforts to obtain leads and assist in the investigation, Suchinsky replied: **"I am going to have to Deputize you!!"**, followed by a police officer emoji.

37.    On November 11, 2020, at 3:27 p.m., Detective Suchinsky sent an email proposing to take Jane Doe on a date: **"sometime dinners on me."**

38.    On or about November 13, 2020, at approximately 6:30 a.m., Detective Suchinsky emailed Jane Doe from his official "phila.gov" email address to ask her if she would come into the Homicide Unit for another interview.

39.    Detective Suchinsky had represented to Jane Doe that the purpose of this second interview was to obtain further information from her independent efforts to look into the circumstances of her son's murder (e.g., identifying potential suspects and leads).

40.    Detective Suchinsky also told Jane Doe he needed her help to facilitate an interview and/or encourage the cooperation of her late son's girlfriend in the homicide investigation.

41.    Detective Suchinsky instructed Jane Doe to call him when she arrived to the PPD Homicide Unit so he could get her a parking spot.

42.    The second meeting with Jane Doe and her late son's girlfriend was scheduled to take place on November 13, 2020; however, Detective Suchinsky, Jim Doe Detective, Jen Doe Detective and/or other PPD officers canceled the interview for reasons unknown to Jane Doe.

43.    On November 14, 2020, at 7:58 a.m., Detective Suchinsky emailed Jane Doe from his official "phila.gov" email address, asking if she could come in for the interview between 10:30 a.m. and 11:00 a.m., and when she responded in the affirmative, Suchinsky replied saying **"LOL…TRY TO BE CLOSER TO 10:30 AM 😊."** Thereafter, Jane Doe changed the subject back to her attempts to canvas social media accounts and identify potential suspects and/or witnesses for purposes of the investigation into her son's murder.

44.    Little did Jane Doe know that Detective Suchinsky's actual plan was to lure her into a sense of security so he could take advantage of and sexually assault her before the second interview in or around the PPD officer-only parking lot behind the police station.

45.    On or about the morning of November 14, 2020, Jane Doe drove to the PPD Homicide Unit in her Honda Accord for a second interview and to help facilitate her son's girlfriend's cooperation with the City's investigators like Detective Suchinsky.

46.    Jane Doe arrived at the PPD Homicide Unit around 10:30 a.m., stopped at or near the corner of the PPD Headquarters in the Chinatown neighborhood, and called Detective Suchinsky as instructed.

47.    Detective Suchinsky came out of the PPD Homicide Unit with a note in his hand, and approached Jane Doe's Honda Accord.

48.    On information and belief, Detective Suchinsky's note purported to authorize Jane Doe to park in the private, gated lot located behind the PPD Headquarters, which is restricted for officer use only.

49.    Detective Suchinsky opened the passenger door, placed the note on the dashboard, sat down in Jane Doe's vehicle, and instructed her where to drive.  Jane Doe was uncomfortable, but followed Detective Suchinsky's instructions given his heralded status as a PPD Homicide Detective who happened to be leading the investigation into her son's murder.

50.    With Detective Suchinsky in the passenger seat, Jane Doe drove around the block to access the police-only parking lot.

51.    While Jane Doe was driving around the corner and following Detective Suchinsky's instructions, he grabbed Jane Doe's breasts and digitally penetrated her vagina.

52.     Helpless and terrified, Jane Doe froze, but after Detective Suchinsky was done sexually assaulting her, she parked her car in the PPD lot.

53.     On information and belief, the PPD and/or the City of Philadelphia District Attorney's Office is in possession of surveillance footage depicting Jane Doe operating her vehicle and driving it to the PPD parking lot at or around the time of Detective Suchinsky's sexual assault, and knew or was deliberately indifferent toward this inappropriate interaction.

54.     After Jane Doe parked her car, she went into the Homicide Unit with Detective Suchinsky, who advised her to remain in the hallway before she provided an interview in the presence of Detective Suchinsky, Jen Doe Detective, and Jim Doe Detective.

55.     During the interview, Jane Doe asked Jen Doe Detective—the only other female in the interview room—to stay in the room during the interview given Detective Suchinsky's predatory assault of her on or about the PPD premises moments earlier.

56.     At the conclusion of the interview, Jim Doe Detective escorted Jane Doe out of the interrogation room and to the lobby of the PPD Headquarters.

57.     Jane Doe spoke with Jim Doe Detective in the lobby for about 10-15 minutes, and explicitly asked if he or someone else could take over the case instead of Detective Suchinsky. Despite having previously observed the inappropriate conduct of Detective Suchinsky directed to Jane Doe during and/or at the end of the first interview days earlier (i.e., the request for a "selfie"), Jim Doe Detective ignored Jane Doe's call for help.

58.     Over the next several months, Jane Doe received numerous emails and phone calls from Detective Suchinsky, as he harassed her in a continuous, desperate attempt to groom her so he could court her and perpetrate additional sexual assaults and unwanted advances.

12

59.    After sexually assaulting Jane Doe, Detective Suchinsky decided to stop emailing her Jane Doe from his official "phila.gov" email address; but rather, switched to his personal Yahoo email address so he could surreptitiously groom and court Jane Doe for another sexual assault of a homicide victim's mother.

60.    Almost every email Detective Suchinsky sent to Jane Doe was in full caps locks, underscoring his position of power and authority, and conveying the unwavering nature of his sexual innuendo and demands.

61.    For instance, on November 30, 2020 at 12:04 p.m., Detective Suchinsky stated **"SHAME YOU DON'T LIVE IN PHILLY."** He then proceeded to provide his personal Yahoo email address and stated: **"EMAIL ME ON MY EMAIL…IF YOU WANT TO 😊."**

62.    On December 1, 2020, at 10:22 a.m., Detective Suchinsky sent an email from his official "phila.gov" email, again asking Jane Doe: **"EMAIL ME BACK ON THE OTHER EMAIL I SENT YOU. 😊."**

63.    Detective Suchinsky continued to send improper emails to Jane Doe at essentially all hours of the day from his personal Yahoo email address, repeatedly referring to her as "sweetie," concluding his improper emails with emojis, and incessantly asking Jane Doe to send him pictures of her.

64.    Detective Suchinsky would also ask Jane Doe to "hang out" or "relax" with him, for no reason other than to groom her and further escalate his entirely improper interactions between lead detective and the mother of the victim whose murder he was investigating.

65.    Detective Suchinsky was purposely cryptic in emails, but would call Jane Doe, explicitly flirt with her, and proposition her to perform sexual acts on or with him.

66.     For example, in one email, Detective Suchinsky proposed: **"you and i can get together but in a different setting other than work and we can relax and talk…we can put our heads together in a more relaxed atmosphere."**

67.     In response to Detective Suchinsky emails, Jane Doe always rebuffed his advances. For example, she would often tell him she was working or change the subject of conversation to her efforts to help the murder investigation (e.g., by passing out flyers seeking leads for information).

68.     However, at all times (and even to this day), Plaintiff lived/lives in fear of Detective Suchinsky.

69.     In one email dated December 3, 2020, at 12:00 p.m., Detective Suchinsky insinuated a *quid pro quo* transaction of a "pay off" (i.e., sexual favors) in exchange for the "technical things" he was doing to investigate the murder of Jane Doe's son, telling her she was **"DOING GREAT THINGS BY ASSISTING ME AND PUTTING OUT POSTERS…HOPEFULLY ALL THE TECHNICAL THINGS ON MY END PAY OFF SOMEDAY."**

70.     When Jane Doe would not respond to Detective Suchinsky's emails, he would badger her by begging her to see him and asking her to disclose her whereabouts and what she was doing.

71.     For example, after the *quid pro quo* email referenced above, later that evening on December 3, 2020, Detective Suchinsky emailed Jane Doe, stating: **"YOU NEED TO GET AWAY… WISH YOU COULD SEE ME…AND I DON'T MEAN AT WORK…"**

72.     Distraught by Detective Suchinsky's advances, but wishing to avoid retaliation against her physically, sexually, or otherwise (including intentional obstruction or deceleration of

14

her son's murder investigation which remains unsolved) if she were to reject or resist Detective Suchinsky, Jane Doe proceeded to "play dumb" by offering benign or brief responses, or not responding at all, to his unwavering, unwanted, and untoward advances.

73.    Still, Detective Suchinsky continued to press Jane Doe, hoping that she would cave to his demands.

74.    On December 15, 2020, at 5:10 p.m., Detective Suchinsky emailed Jane Doe from his Yahoo email, asking **"YOU KNOW WHAT I MEAN BY WHAT I SAID TO YOU LAST… RIGHT?"**, referring to one of his many sexually-charged phone calls in November and December.

75.    Detective Suchinsky continued to call Jane Doe to discuss his explicit sexual desires.

76.    In another email dated January 20, 2021, at 8:03 a.m., Detective Suchinsky asked Jane Doe, who works as a nursing aid for the elderly, **"HEY SERIOUSLY I WANT TO SEE YOU…SEND ME A PIC…WHAT COLOR SCRUBS YOU WEARING TODAY?"**

77.    Undeterred by Jane Doe's her refusal to respond favorably to any of his advances, Detective Suchinsky continued to send six (6) more emails to her.

78.    During one phone call on or about February 1, 2021, Detective Suchinsky told Jane Doe about his desire to perform and receive oral sex on/from her, have sexual intercourse with her, and how he could not stop thinking about laying in bed with her.

79.    Detective Suchinsky then followed up with emails in which he clearly continued to refer to and exploit his position of power and authority to try to take advantage of Jane Doe, stating: **"WHAT DO YOU THINK ABOUT THAT? NOTHING WOULD INTERFER [sic] WITH THE INVESTIGATION...I WANT TO RELAX AND CHILL WITH YOU."**

80.    Between November 2020 and February 2021, Detective Suchinsky called Jane Doe almost every day, and on most occasions, multiple times per day.  It was during his phone calls when Suchinsky was explicit about his inappropriate sexual desires to avoid leaving a paper trail of these far-more-explicit communications.

81.    In February or March 2021, Jane Doe ceased communications with Detective Suchinsky for her personal safety, but only after being traumatized and re-traumatized over several months follow the sexual assault by Detective Suchinsky's constant contacts permitted by Defendants.

82.    Unfortunately, the issue of sexual misconduct and intimidating behavior exhibited by PPD officers is not new to the City.

83.    Indeed, for years before Detective Suchinsky sexually groomed, assaulted, and harassed Plaintiff, the PPD has a public, documented history of police officers—including homicide detectives—who groomed and sexually assaulted subjects of investigations.

84.    For instance, Detective Philip Nordo was arrested in 2017 and convicted in 2022 on charges of rape, sexual assault, indecent assault, official oppression, stalking, and other offenses related to sexually assaultive and coercive behavior directed to male suspects, witnesses, informants, and individuals who were otherwise involved in his investigations dating back to at least 2012.

85.    Similarly, last year, retired Philadelphia police officer Patrick Heron was arrested for unlawful sexual contact with minors, as well as witness retaliation, harassment, and stalking of adults and juveniles to cover up his official misconduct.

86.    The Philadelphia District Attorney's Office, in connection with Detective Nordo's conviction, openly acknowledged that it was aware of his sexual misconduct as early as 2005, but

for years failed to hold him and other police officers accountable for abuses of their power and authority.

87.     Before Detective Nordo and Officer Heron, there was former Philadelphia police officer Michael Paige, who in 2007 sexually assaulted a man while on-duty in Fairmount Park—conduct for which a federal jury returned a verdict for the man due to the violation of his bodily integrity and the resultant emotional distress. Remarkably, despite being initially dismissed from the police force, officer Paige was subsequently hired by the City in October 2021 to work in the Sheriff's Office.

88.     In 2020, months before Detective Suchinsky's sexual misconduct at issue, former PPD officer Sean Renaldo Stewart was charged with involuntary deviate sexual intercourse, statutory sexual assault, and aggravated indecent assault of a woman dating back to the late 1990s, when the victim was just 13 years old.

89.     In July 2020, PPD officer Rahim Montgomery, a twenty-year veteran of the PPD, was arrested after the Internal Affairs Division concluded he sexually assaulted a minor. He was charged with unlawful contact with a minor, indecent assault, and other associated offenses.

90.     In 2019, PPD officer Novice Sloan was arrested and charged with sexual assault and related crimes after drugging a woman and filming himself having sexual intercourse with her without consent.

91.     In 2014, PPD officer Thomas Tolstoy was accused by three women of sexually assaulting them, and even Police Commissioner Charles Ramsey publicly stated: "I'm stuck with a guy who shouldn't be a cop."

92.    In 2011, PPD officer Keith Corley was charged with rape, indecent assault, sexual assault, and other related offenses after he forced a female victim in her 30's (much like Plaintiff here) to perform sexual acts on him.

93.    Even in the upper echelons of PPD leadership, the culture persists.

94.    In 2019, PPD Commissioner Richard Ross, Jr. resigned amidst allegations of sexual harassment in the police department. After former Commissioner Ross's resignation, Philadelphia Mayor Jim Kenney stated: "I do not believe the police department has taken the necessary actions to address the underlying cultural issues that too often negatively impact women – especially women of color."

95.    Also in 2019, former PPD inspector Carl Holmes, Jr. was charged with sexually assaulting three female officers after a grand jury concluded he abused his power as a police academy instructor/mentor. The City settled a subsequent sexual harassment lawsuit in connection with this misconduct.

96.    However, for every publicly reported instance of PPD officers who have engaged in sexual misconduct, there are numerous instances which have been concealed from the public, investigated internally by the City and/or Internal Affairs, and/or resolved confidentially, but which nevertheless signify the laissez-faire approach to oversight and discipline of officers in the PPD who have engaged in sexual misconduct over many years prior to the sexual assault committed by Detective Suchinsky.

97.    Detective Suchinsky is known to the City and the PPD as an officer who has engaged in misconduct, including falsification of police reports and coordinating this misrepresentations about his on-duty work for his own benefit.

98.     Specifically, many years before his sexual assault of Plaintiff, the PPD's Internal Affairs Division concluded that Detective Suchinsky knowingly, and willfully falsified a police incident report and his written report to an investigating detective, along with investigation reports and an Official Fire Department Report for the purpose of unlawfully identifying himself and his partner as the officers who rescued a citizen from the second floor of the fire.

99.     Detective Suchinsky then gave the falsified reports to a sergeant and captain. As a result of wrongfully identifying himself as the rescuing officer, Suchinsky's Captain requested the Police Commissioner honor Suchinsky and his partner with Heroism Commendations.

100.     Detective Suchinsky lied not only by falsifying multiple official, governmental reports in writing, but also by verbally lying to his superior ranking officers by misrepresenting to them that he rescued the house fire victim.

101.     Internal Affairs also found that Detective Suchinsky's partner was complicit in this scheme to identify themselves as the rescuers, and the partner failed to report this misconduct up the chain of command.

102.     The above example of Detective Suchinsky's misconduct earlier in his career, in which he falsified reports, enlisted the help of his colleagues, and made material misrepresentations of his on-duty activity, is exemplar of the type of PPD officer Detective Suchinsky is and what he is willing to do to get what he wants.

103.     Despite this prior incident, the City allowed Detective Suchinsky to work his way up the ranks to a Homicide Detective, placed him in charge of the investigation into Plaintiff's son's murder, allowed him to control the investigation, unhinged, and enabled him to conduct himself completely unsupervised to such a degree that he felt comfortable grooming Plaintiff for

the sexual assault and subsequent harassment that ensued between the months of November 2020 and at least February 2021.

104.    Instead of ensuring that Detective Suchinsky was properly interacting with Plaintiff Jane Doe in a manner consistent with and in furtherance of his job duties as an officer leading the investigation into the murder of Jane Doe's son, the City, the PPD, and its officers, employees, and agents like Jen Doe Detective, Jim Doe Detective, and John Doe Supervisors 1-5 willfully disregarded Detective Suchinsky's behavior and recklessly failed to protect Jane Doe from one of their own.

105.    As a direct and proximate result of the City's cavalier acts and omissions, Detective Suchinsky was enabled to groom, manipulate, sexually assault and repeatedly harass Jane Doe over the course of several months.

106.    Detective Suchinsky engaged in a strategic, orchestrated, but easily discoverable and preventable plot to control Jane Doe so that he could force himself upon her and continue to harass her under the cloak of authority as lead detective on her son's murder investigation, a position provided to him by the City, through the PPD and its Homicide Unit.

107.    The Supervising Defendants elected to ignore all warning signs of Detective Suchinsky's constant unwanted courting and harassment of Plaintiff, including but not limited to: disciplining the prior instances of misconduct by Detective Suchinsky, monitoring use of his official "phila.gov" email address and official PPD telephone, identifying his inappropriate entry into her vehicle before the second interview, and overseeing and/or limiting the gratuitous use of the officer-only parking lot.

108.     The Supervising Defendants put their heads in the sand, and as a result, exposed Jane Doe to a horrific instance of sexual assault on or about the PPD premises, and the repeated harassment that ensued thereafter during the murder investigation.

109.     Detective Suchinsky was, at all relevant times, an employee of the City, and acting in the course and scope of his employment as an officer of the PPD and the Homicide Detective leading the investigation into Jane Doe's son, and using his agency as a mechanism to forcefully seduce, groom, sexually assault, manipulate, and continually badger and harass Plaintiff, Jane Doe.

110.     All of the Supervising Defendants' acts and failures to act were deliberate, willful, and performed in callous disregard of Plaintiff, Jane Doe's personal safety and wellbeing, in order to preserve the City's integrity, even if it meant allowing Suchinsky to sexually assault and regularly and repeatedly harass and badger her while he led the investigation into her son's murder.

111.     Upon information and belief, the Supervising Defendants were aware or were deliberately indifferent toward Detective Suchinsky's improper physical contacts, investigation activity, and his subsequent conduct and interactions with Plaintiff Jane Doe.

112.     By conducting themselves as described above, the Supervising Defendants manifested actual and/or constructive knowledge of Detective Suchinsky's acts, acknowledged the impropriety of his conduct, affirmatively took action, and enabled him to further groom and sexually assault Plaintiff, who was left to her own devices to protect herself.

113.     Other individuals that were aware and/or deliberately indifferent toward Detective Suchinsky's conduct (e.g., the identities of John Doe Supervisors 1-5), is information in the sole control of Defendants and will be identified during the course of discovery in this matter, including but not limited to Jen Doe Detective, Jim Doe Detective, and other City and/or PPD officers, security, staff, administrators and employees, who were individually and collectively duty-bound

by oath and/or common law, and responsible for: monitoring the comings and goings of Detective Suchinsky; overseeing his actions to investigate Jane Doe's son's murder; surveilling the premises of the PPD Headquarters where his sexual assault of Jane Doe occurred; reporting, investigating, and properly responding to and disciplining officer misconduct; ensuring witnesses, victims, families, and persons involved in PPD investigations are not harmed by officers; monitoring the use of official PPD email addresses and governmental phone lines; and promulgating, implementing, and enforcing the City and PPD's policies, procedures and protocols (or failing to do so) governing all of these responsibilities.

114.    By reason of their failure and/or refusal to report, investigate, reprimand, and/or discipline Detective Suchinsky, the City and its agents allowed Detective Suchinsky to have unimpeded access to Plaintiff, Jane Doe, without fear of repercussions for roughly three months, in reckless disregard and deliberate indifference to her safety, health, and wellbeing.

115.    The Supervising Defendants impliedly and/or expressly authorized Suchinsky's improprieties toward her, signaling to him that it was okay to sexually assault Jane Doe and escalate his misconduct.  As a result, Detective Suchinsky despicably used her son's murder as a means of taking advantage of her.

116.    It is only due to the recklessness, wanton and willful misconduct, and deliberate indifference of the City, by signaling to Detective Suchinsky that his misconduct was acceptable, that the next-of-kin and surviving mother of a murder victim could be subjected to Detective Suchinsky's abuse of power and authority as described herein.

117.    As a result of being sexually assaulted and subjected to Detective Suchinsky's incessant harassment and manipulation, Jane Doe has sustained severe trauma and mental anguish, and her entire life has been upended and permanently damaged.

118.    Detective Suchinsky's sexual assault and harassment of Jane Doe was caused solely and exclusively by the recklessness, wanton and willful misconduct, and deliberate indifference of the Supervising Defendants.

119.    In no manner was any of Detective Suchinsky's conduct alleged herein due to any act or failure to act on the part of Jane Doe.

120.    But-for the reckless, wanton, willfully blind, and deliberately indifferent acts and omissions of the Supervising Defendants, Jane Doe would not have been subjected to Detective Suchinsky's deplorable acts of sexual assault and harassment.

121.    As a direct and proximate result of the recklessness, wanton and willful misconduct, and deliberate indifference of Defendants, their employees, agents, apparent and/or actual, and/or servants, Jane Doe suffered severe and permanent damages, including, *inter alia*, involuntary sexual relations and its signs, symptoms and sequalae; emotional distress in the form of anxiety, fear, fright, and depression; various and severe painful bodily injuries; past and future severe psychological and psychiatric injuries and conditions; past and future pain and suffering; past and future medical expenses; past and future embarrassment and humiliation; past and future loss of life's pleasures; past lost wages and loss of future earnings capacity; and/or all other damages as may be permitted under law.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

**COUNT I**
**42 U.S.C. §1983 – STATE-CREATED DANGER**
**Plaintiff, Jane Doe L.S. v. Defendants, John Doe Supervisors 1-5, Jim Doe Detective, Jen Doe Detective, and Donald Suchinsky**

122.    The preceding paragraphs of this Complaint are incorporated by reference herein.

123.    At all relevant times, John Doe Supervisors 1-5 were persons acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing criminal investigations such as the murder of Plaintiff's son, and/or managing and supervising the affairs, conduct, and activity of officers and detectives in the Homicide Unit, like Detective Donald Suchinsky, Jim Doe Detective, and Jen Doe Detective, who were assigned to investigations to ensure they were acting constitutionally.

124.    At all relevant times, Jim Doe Detective and Jen Doe Detective were persons acting under color of state law pursuant to 42 U.S.C. §1983 by investigating crimes such as the murder of Plaintiff's son, and/or assisting Detective Suchinsky as fellow detectives and/or officers of the PPD or Homicide Unit interacting with witnesses, informants, and other persons with knowledge relevant to the investigation, such as Plaintiff, and were responsible under PPD policy to identify warning signs and report suspicions or knowledge of sexual grooming, assault, and/or harassment of Plaintiff to John Doe Supervisors 1-5.

125.    At all relevant times, Detective Suchinsky, Jim Doe Detective, Jen Doe Detective, and John Doe Supervisors 1-5 were bound by the Fourteenth Amendments to the United States Constitution.

126.    At all relevant times, a "special relationship" existed between Detective Suchinsky, Jim Doe Detective, Jen Doe Detective, and John Doe Supervisors 1-5, and Plaintiff while she was interacting with them and/or on the premises of the Philadelphia Police Department for purposes of the state-authorized investigation into her son's murder.

127.    At all relevant times, Jim Doe Detective, Jen Doe Detective, and John Doe Supervisors 1-5 were aware of prior sexual misconduct by Detective Suchinsky directed to female witnesses, victims, informants, and other citizens who were subjects of or involved with criminal investigations like the one Detective Suchinsky was assigned to in this case.

128.    At all relevant times, Plaintiff enjoyed a substantive due process right to bodily integrity, free from unreasonable intrusions and sexual advances by officers of the PPD and the Homicide Unit, such as Detective Suchinsky.

129.    As described above, the misconduct and abuse of power by Detective Suchinsky—in sexually grooming, assaulting, and harassing Plaintiff over several months while he led the investigation into her son's murder—is so egregious and outrageous, that it shocks the conscience.

130.    Defendants, Jim Doe Detective, Jen Doe Detective, and John Doe Supervisors 1-5, allowed, deliberately failed to report, and/or consciously disregarded the consequences of Detective Suchinsky sexually grooming, assaulting, and harassing Plaintiff.

131.    The misconduct of Jim Doe Detective, Jen Doe Detective, and John Doe Supervisors 1-5 demonstrates deliberate indifference to a risk of harm so unreasonable and outrageous that it shocks the conscience.

132.    Any reasonable officer of the PPD, such as Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5, would understand that Detective' Suchinsky's sexual misconduct, as identified herein, was constitutionally prohibited under rudimentary concepts of due process and any standard of acceptable police officer behavior in civilized society.

133.    The specific harms to which Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5 exposed Plaintiff (i.e., Detective Suchinsky's sexual advances) was

foreseeable and direct, in that they knew that Detective Suchinsky posed an unreasonable but substantial and foreseeable risk of harm to Plaintiff.

134.    Plaintiff was a foreseeable victim of Detective Suchinsky's sexual misconduct because she was single, the surviving mother of a murder victim, interacted with PPD on its premises during the investigation, and was often placed in direct one-on-one contact with Detective Suchinsky, without any supervision or involvement on the part of Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5.

135.    As a direct consequence of the leeway provided to him by Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5's acquiescence in his behavior, Detective Suchinsky saw Plaintiff as an opportune prospect to sexually groom, assault, and harass, and took advantage of her as a direct consequence.

136.    Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5 affirmatively used or abused their authority under color of law in a way that created the danger posed by Detective Suchinsky by recklessly failing to supervise him, purposely refusing to or report his misconduct up the chain of command, deliberately deciding not to punish his past transgressions, promoting him to be a detective in the Homicide Unit, assigning him to this case without any supervision of his conduct and investigative activity, and then intentionally looking the other way as he engaged in sexual misconduct directed to Plaintiff and other citizens involved in PPD investigations.

137.    The reckless supervision and deliberate failure of John Doe Supervisors 1-5 to monitor Detective Suchinsky's activity in this particular investigation represented a continuation of the widespread and pervasive culture of self-preservation in the PPD whereby the City turned a blind eye toward and deliberately failed to adequately punish and discipline PPD officers,

detectives, or staff who sexually groomed, assaulted, and harassed citizens who were directly or incidentally involved in criminal investigations.

138.    In direct contravention and violation of the Fourteenth Amendment and, upon information and belief, in violation of the City and/or PPD's own policies, procedures, and regulations, Detective Suchinsky sexually groomed, assaulted, and incessantly harassed Plaintiff over several months after he was assigned to lead the investigation into her son's murder.

139.    In direct contravention and violation of the Fourteenth Amendment and, upon information and belief, in violation of the City and/or PPD's own policies, procedures, and regulations, John Doe Supervisors 1-5 affirmatively created the danger or risk of harm by placing Detective Suchinsky—an officer who was found to have falsified official government reports previously and on information and belief, engaged in similar sexual misconduct prior to the sexual assault in this case.—in a position to commit the despicable acts described herein.

140.    Detective Suchinsky, Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5, while acting under color of state law, unlawfully and/or unreasonably, willfully, recklessly, maliciously and/or with deliberate indifference, and deprived Plaintiff of her right to bodily autonomy and to be free from sexual assault by an agent of the government, as guaranteed by the U.S. Constitution, in that these Defendants, without lawful basis, are each culpable for causing the sexual grooming, assault, and harassment to occur by creating the danger to which Plaintiff was exposed.

141.    Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5 were complicit in the sexual grooming, assault, and harassment of Plaintiff, and willfully disregarded her safety and rights despite having ample time and opportunity to formulate a judgment and an appropriate response in view of the clearly unconstitutional misconduct of Detective Suchinsky.

27

142.     Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5 deliberately failed to do anything to prevent or mitigate the ongoing sexual assault and harassment by Detective Suchinsky, and therefore exhibited a reckless indifference toward Plaintiff's physical and psychology well-being to such a degree that it violated her substantive due process rights.

143.     The deliberately indifferent acts and omissions of Jim Doe Detective, Jen Doe Detective, John Doe Supervisors 1-5, and Detective Suchinsky violated Plaintiff's constitutional right to personal liberty, bodily autonomy, and security, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

144.     The acts and omissions of Jim Doe Detective, Jen Doe Detective, John Doe Supervisors 1-5, and Detective Suchinsky were the direct and proximate cause of Plaintiff's physical injuries and resultant emotional harms.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

**COUNT II**
**42 U.S.C. §1983 – MUNICIPAL LIABILITY**
**POLICY, CUSTOM, PATTERN AND PRACTICE**
**Plaintiff, Jane Doe L.S. v. Defendant, City of Philadelphia**

145.    The preceding paragraphs of this Complaint are incorporated by reference herein.

146.    The City of Philadelphia had a special responsibility and obligation to ensure that citizens and members of the community, and in particular crime victims, their family members, and other witnesses, informants, citizens or even suspects/targets of criminal investigations, were protected from intrusions upon their bodily security, autonomy, and freedom via sexual assault and harassment by their own agents, servants and/or employees.

147.    The City abjectly failed to honor its obligation in this regard through deficient and inadequate policies and procedures, or decisive customs and practices, which established a pattern of allowing officers, detectives, and agents of the PPD, like Detective Suchinsky, to use the police badge as a means of exercising control over and manipulating control over persons with whom they came into contact.

148.    The aforementioned misconduct and criminal proceedings against sworn officers of the PPD, preceding the sexual misconduct by Detective Suchinsky, along with the public statements by the District Attorney's Office regarding sexual misconduct in the PPD dating back decades, confirm a longstanding culture of self-preservation and sexual improprieties in the PPD which clearly remains pervasive, as corroborated from Detective Suchinsky's level of comfort in (a) cultivating an entirely improper relationship with the use of his official government email and the City's phone lines; (b) committing a sexual assault of a murder victim's mother on or about the City's premises; and (c) attempting to conceal his misconduct through the use of personal communications devices to maintain exclusive contact with Plaintiff.

149.    Detective Suchinsky was enabled by the City's widespread culture authorizing and/or acquiescing sexual misconduct leading to the sexual assault of Jane Doe and the ensuing harassment over several months, during which time he repeatedly and incessantly harassed her through the use of his government email address and the City's phone lines.

150.    Defendant, City of Philadelphia has adopted and maintained for many years policies, customs and practices before November 2020, which were recognized and accepted within the PPD, and created conditions which posed an extraordinarily unreasonable risk of constitutional injury, and in fact did cause Plaintiff to sustain constitutional harm through:

> (a)    A custom, policy and practice of allowing private arrangements and/or favors exchanged between investigating officers, detectives, witnesses, and victims;
>
> (b)    A custom, policy and practice of allowing investigating officers and/or detectives to perform their duties with partiality to certain individuals;
>
> (c)    A custom, policy and practice of allowing investigating officers and/or detectives to spend disproportionate time interacting with particular individuals without proper supervision, documentation, or oversight relative to the investigative activity taking place;
>
> (d)    A custom, policy and practice of ignoring, failing to report, and/or downplaying the seriousness of officer or detective misconduct including sexual assault, thereby acquiescing to an environment where sexual assault is accepted;
>
> (e)    A custom, policy and practice of failing to appropriately identify victims or witnesses who are particularly vulnerable to advances by a known bad actor like Detective Suchinsky;
>
> (f)    A custom, policy and practice of failing to adequately, properly, and timely respond to victims or witnesses who report being sexually groomed, assaulted, or harassed by officers or investigators on their case;
>
> (g)    A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via use of governmental phones and emails for personal reasons and/or without proper supervision; and
>
> (h)    A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via personal text message, phone calls, emails for reasons unrelated to job functions.

151.    The City knew about and/or were deliberately indifferent to the consequences of establishing and maintaining the above-referenced policies, practices or customs which directly caused Plaintiff's constitutional harm.

152.    The City knew about and/or were deliberately indifferent to the creation of dangerous conditions and environments that unreasonably placed victims and witnesses like Plaintiff in positions of extreme vulnerability, increased risk of severe injury and, and ultimately caused Plaintiff to suffer tremendous physical, emotional, and constitutional injuries.

153.    Defendants' recklessness and deliberate indifference toward individuals like Plaintiff—as expressed through the policies, policies, customs, and patterns of practice noted above—bears a substantial causal nexus with the violation of Plaintiff's right to substantive due process under the Fourteenth Amendment of the Constitution of the United States, the laws of the United States, in violation of 42 U.S.C. §1983.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

**COUNT III**
**42 U.S.C. §1983 – MUNICIPAL LIABILITY**
**FAILURE TO SUPERVISE, TRAIN, AND SCREEN**
**Plaintiff, Jane Doe L.S. v. Defendant, City of Philadelphia**

154.    The preceding paragraphs of this Complaint are incorporated by reference herein.

155.    Defendant, City of Philadelphia's failure to train officers of the PPD like Detective Suchinsky, Jim Doe Detective, Jen Doe Detective, and/or John Doe Supervisors 1-5 amounted to a deliberate indifference to the rights of individuals who came into contact with him in the course of investigations performed by him, like the one into the murder of Plaintiff's son.

156.    Based on the above-referenced history of sexual assaults by PPD officers before November 2020, and Detective Suchinsky's own history of misconduct, it was obvious the City needed to implement a more robust, rigorous, and different program for training and supervising its ranking officers and supervisors—such as John Doe Supervisors 1-5—to encourage self-policing within the PPD, and deter and prevent subordinate officers from ignoring warning signs of abuses of power including sexual abuse of witnesses, informants, and others who are involved in criminal investigations.

157.    Based on the above-referenced history of sexual assaults by PPD officers before November 2020, and Detective Suchinsky's own history of misconduct, it was obvious the City needed to implement a more robust, rigorous, and different program for training and supervising its police officers, detectives, and/or agents—such as Jim Doe Detective and Jen Doe Detective—to appropriately identify and respond to the incidents of sexual grooming, assault and harassment amongst the police force.

158.    Based on the above-referenced history of sexual assaults by PPD officers before November 2020, and Detective Suchinsky's own history of misconduct, it was obvious the City needed to implement a more robust, rigorous, and different screening process of its police force

before promoting officers like Detective Suchinsky with a documented history of officer misconduct.

159.    Defendant, City of Philadelphia has adopted and maintained for many years policies, customs and practices before November 2020, which were recognized and accepted within the PPD, and created conditions which posed an extraordinarily unreasonable risk of constitutional injury, and in fact did cause Plaintiff to sustain constitutional harm through:

(a)    A custom, policy and practice of failing to properly train, supervise, investigate and discipline officers in order to prevent sexual assaults from occurring; and

(b)    A custom, policy and practice of failing to properly train, supervise, investigate and discipline correctional staff to ensure that premises of the PPD, including parking facilities, are appropriately used only by officers and/or by others specifically authorized by the PPD as an institution controlling its premises.

160.    The City's need for a more rigorous training program of its officers was so apparent and lacking that the City was deliberately indifferent to the likelihood that prior incident of sexual misconduct by Detective Suchinsky and/or his contemporaries, colleagues, co-workers, and other officers in the PPD and Homicide Unit.

161.    Based on the history of sexual assaults by PPD officers, and Homicide Unit Detectives in particular, the likelihood that sexual misconduct by Detective Suchinsky would repeat itself was so apparent and predictable that the failure to train Detective Suchinsky and his colleagues on sexual assault and how to appropriately prevent, identify, and respond to same, constitutes an actionable violation of a constitutional right under the standards flowing from substantive due process pursuant to the Fourteenth Amendment of the U.S. Constitution.

162.    Defendants' recklessness and deliberate indifference toward individuals like Plaintiff—as expressed through the failures to train described herein—bears a substantial causal nexus with the violation of Plaintiff's right to substantive due process under the Fourteenth

Amendment of the Constitution of the United States, the laws of the United States, in violation of 42 U.S.C. §1983.

      **WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

**COUNT IV**
**42 U.S.C. §1983 – SUPERVISORY LIABILITY**
**Plaintiff, Jane Doe L.S. v. Defendants, John Doe Supervisors 1-5**

163.    The preceding paragraphs of this Complaint are incorporated by reference herein.

164.    At all relevant times, John Doe Supervisors 1-5 were executive administrators with policymaking authority, including but not limited to when and how to discipline officers who engaged in misconduct, when and to what role officers should be promoted, and the consideration of an officer's prior misconduct in making personnel decisions like promoting Detective Suchinsky from a police officer to homicide detective and assigning him to investigate particular cases like the murder of Plaintiff's son.

165.    John Doe Supervisors 1-5, with deliberate indifference to the consequences of Detective Suchinsky's sexual grooming, assault, and harassment of Plaintiff, knew about and acquiesced in Detective Suchinsky's prior misconduct; and/or established and maintained the following policies, practices, or customs applicable to handling sexual misconduct within the PPD before November 2020:

(a)    A custom, policy and practice of allowing private arrangements and/or favors exchanged between investigating officers, detectives, witnesses, and victims;

(b)    A custom, policy and practice of allowing investigating officers and/or detectives to perform their duties with partiality to certain individuals;

(c)    A custom, policy and practice of allowing investigating officers and/or detectives to spend disproportionate time interacting with particular individuals without proper supervision, documentation, or oversight relative to the investigative activity taking place;

(d)    A custom, policy and practice of ignoring, failing to report, and/or downplaying the seriousness of officer or detective misconduct including sexual assault, thereby acquiescing to an environment where sexual assault is accepted;

(e)    A custom, policy and practice of failing to appropriately identify victims or witnesses who are particularly vulnerable to advances by a known bad actor like Detective Suchinsky;

(f)    A custom, policy and practice of failing to adequately, properly, and timely respond to victims or witnesses who report being sexually groomed, assaulted, or harassed by officers or investigators on their case;

35

    (g)    A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via use of governmental phones and emails for personal reasons and/or without proper supervision;

    (h)    A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via personal text message, phone calls, emails for reasons unrelated to job functions;

    (i)    A custom, policy and practice of failing to properly train, supervise, investigate and discipline officers in order to prevent sexual assaults from occurring; and/or

    (j)    A custom, policy and practice of failing to properly train, supervise, investigate and discipline correctional staff to ensure that premises of the PPD, including parking facilities, are appropriately used only by officers and/or by others specifically authorized by the PPD as an institution controlling its premises.

166. The need for more scrupulous supervision of officers in the PPD generally, and in this case of the Homicide Unit specifically, was so readily apparent that John Doe Supervisors 1-5 were deliberately indifferent to the risk that Detective Suchinsky would abuse his position of power to sexually groom, assault, and harass Plaintiff using the investigative devices and authority conferred upon him by John Doe Supervisors 1-5.

167. John Doe Supervisors 1-5 were culpable in the training, supervision, and control of subordinates like Detective Suchinsky, as well as Jim Doe Detective and Jen Doe Detective.

168. As a direct result of the deliberate indifference to Detective Suchinsky's conduct and misconduct in connection with the investigation into the murder of Plaintiff's son, Jane Doe was sexually groomed, assaulted, and harassed between November and February 2021.

169. John Doe Supervisors 1-5 violated Plaintiff's right to substantive due process under the Fourteenth Amendment of the Constitution of the United States, the laws of the United States, in violation of 42 U.S.C. §1983 because they personally participated and acquiesced in the intrusion on her substantive due process rights to bodily freedom and integrity under the Fourteenth Amendment of the U.S. Constitution.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

## COUNT V – BATTERY
**Plaintiff, Jane Doe L.S. v. Defendant, Detective Donald Suchinsky**

170.    The preceding paragraphs of this Complaint are incorporated by reference herein.

171.    As described herein, Detective Suchinsky initiated multiple unwanted, offensive, and/or harmful contacts of a physical and sexual nature upon Plaintiff Jane Doe's body and person by fondling her breasts and digitally penetrating her vagina in November 2020.

172.    By sexually assaulting Plaintiff Jane Doe in the confines of her vehicle on the premises of the PPD, Detective Suchinsky intended to cause a harmful or offensive contact with her body and person, and desired the consequences flowing therefrom.

173.    The contact with Plaintiff Jane Doe's body was offensive such that it would offend a reasonable person's personal sense of dignity.

174.    Detective Suchinsky's nonconsensual sexual contacts with Jane Doe's body was so offensive that it would constitute violations of the following criminal statutes:

    (a)    Indecent Assault (18 Pa. Cons. Stat. Ann. § 3126);
    (b)    Aggravated Indecent Assault (18 Pa. Cons. Stat. Ann. § 3125);
    (c)    Simple Assault (18 Pa. Cons. Stat. Ann. § 2701); and
    (d)    Aggravated Assault (18 Pa. Cons. Stat. Ann. § 2702).

175.    Detective Suchinsky desired and knew the likely consequences of his sexual assault and harassment of Jane Doe, including but not limited to the resultant fear and submission of Jane Doe to his status of power and badge of authority.

176.    Plaintiff Jane Doe never consented to Detective Suchinsky's unwanted, offensive, and/or harmful contacts of a physical and sexual nature upon her body and person.

177.    The harms, injuries, losses and damages suffered by Plaintiff Jane Doe were directly and proximately caused by the outrageous, willful, wanton, and malicious conduct of the

Detective Suchinsky, as described more fully herein, from November 2020 through at least February 2021.

178.    Because of the grossly negligent, wanton, and outrageous conduct of Detective Suchinsky, which shocks the conscious as set forth in this Complaint, Plaintiff is entitled to punitive damages against him.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

## COUNT VI – ASSAULT
### Plaintiff v. Defendant, Donald Suchinsky ("Detective Suchinsky")

179.    The preceding paragraphs of this Complaint are incorporated by reference herein.

180.    Before, during, contemporaneous with, and after Detective Suchinsky's physical and sexual assault of Plaintiff Jane Doe in or around the PPD parking lot in November 2020, he intended to cause a harmful or offensive contact, or an imminent apprehension of such contact, with Jane Doe.

181.    After the sexual assault in or around the PPD parking lot in November 2020, Jane Doe was reasonably placed in imminent apprehension of harmful or offensive contacts, such as additional or escalated sexual assaults or advances, any time Detective Suchinsky called, emailed, or personally interacted with her, causing re-traumatization and aggravation of the physical invasion of her bodily autonomy and security, and the resultant physical and emotional injuries sustained in the underlying sexual assault in November 2020.

182.    Jane Doe's objective imminent apprehension and fear of further harmful or offensive contacts was informed in large part by Detective Suchinsky's role as a PPD Homicide Detective assigned to lead the investigation into her son's murder, and his ongoing capacity in that role through at least February 2021.

183.    Detective Suchinsky desired, intended, and knew the likely consequences of sexually assaulting Plaintiff Jane Doe without her consent, and then continually harassing and badgering her through incessant and inappropriate phone calls and emails.

184.    Detective Suchinsky used his status of authority and power, granted to him by way of employment with the PPD, and more specifically his assignment to lead the investigation into the murder of Plaintiff Jane Doe's son, to take advantage of Jane Doe and intentionally inflict fear, physical harm, and emotional distress upon her by sexually assaulting Jane Doe, and then harassing

and badgering her through incessant and inappropriate phone calls and emails, for the obvious purpose of pleasing himself and placing her in fear and apprehension of physical harm.

185.    As a result of Detective Suchinsky's intentional conduct, as described herein, Plaintiff Jane Doe was placed and remains in reasonable in fear of imminent offensive and harmful contacts to her body.

186.    The harms, injuries, losses and damages suffered by Plaintiff Jane Doe were directly and proximately caused by the outrageous, willful, wanton, malicious conduct of the Detective Suchinsky, as described more fully herein.

187.    Because of the grossly negligent, wanton, and outrageous conduct of Detective Suchinsky, which shocks the conscious as set forth in this Complaint, Plaintiff is entitled to punitive damages against him.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Plaintiff v. Defendant, Donald Suchinsky ("Detective Suchinsky")

188.    The preceding paragraphs of this Complaint are incorporated by reference herein.

189.    Detective Suchinsky, by and through his physical contacts, sexual assault, and the electronic and verbal interactions with Plaintiff Jane Doe, as described above, intentionally committed multiple acts of extreme and outrageous conduct directed toward her.

190.    Detective Suchinsky's conduct goes beyond all bounds of decency and is utterly intolerable in any civilized community.

191.    Detective Suchinsky, by and through his outrageous and harmful physical contacts, sexual assault, and verbal interactions with Plaintiff Jane Doe, as described above, caused severe emotional, psychological, and psychiatric injuries, distress and harm to her.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages, as well as other relief indicated below, against Defendants, jointly and/or severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus interest, costs, attorney's fees and delay damages.

## PRAYER FOR RELIEF

192.    In consideration of the foregoing claims, Counts I through VI, arising out of all Defendants' conduct as alleged herein, Plaintiff requests an award of damages against Defendants, jointly and severally, in excess of $150,000.00 Dollars with respect to each cause of action, including but not limited to:

a.    all available compensatory damages for the described losses;
b.    past and future lost wages and loss of earning capacity;
c.    past and future emotional distress;
d.    consequential and/or special damages;
e.    all available non-economic damages, including without limitation pain, suffering, fear, anguish and loss of enjoyment of life;
f.    punitive damages;
g.    any and all statutory damages available under 42 U.S.C. §1983
h.    any and all damages at common law recoverable under Pennsylvania law;
i.    reasonable and recoverable attorney's fees;
j.    costs of this action;
k.    delay damages; and
l.    pre-judgment and all other interest recoverable.

Respectfully Submitted,



*Joshua Van Naarden*
_____
Joshua Van Naarden, Esquire (Pa. ID #86740)
Daniel P. Rosner, Esquire (Pa. ID #327999)
Two Commerce Square
2001 Market Street, Suite 3700
Philadelphia, PA 19103
215-960-0000

Dated:  January 27, 2023                *Attorneys for Plaintiff*