**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE, L.S.,** *a pseudonym*,<br><br>    Plaintiff,<br><br>    *v.*<br><br>**CITY OF PHILADELPHIA**, *et al.*,<br><br>    Defendants. | **CIVIL ACTION**<br><br>**NO. 23-0342-KSM** |

**MEMORANDUM**

MARSTON, J.                                            August 15, 2023

On January 27, 2023, Plaintiff initiated this action under the pseudonym "Jane Doe, L.S."
against the City of Philadelphia, Donald Suchinsky (a former detective with the City of
Philadelphia Police Department), and multiple "Doe" supervisors and detectives (collectively,
the "Doe Defendants").  (Doc. No. 1.)  Plaintiff alleges that Suchinsky "sexually assaulted and
repeatedly sexually harassed" her after being appointed as the lead homicide detective
investigating the murder of Plaintiff's son, and that the City, Doe supervisors, and Doe detectives
knew Suchinsky acted inappropriately toward Plaintiff and other women but refused address it.
(Doc. No. 10 at ¶¶ 1, 5–7.)  Plaintiff sues all Defendants under 42 U.S.C. § 1983.  (*Id.* at ¶¶ 151–
201 (Counts I–IV).)  She also brings state law claims of assault, battery, and intentional infliction
of emotional distress ("IIED") against Suchinsky.  (*Id.* at ¶¶ 202–23 (Counts V–VII).)

The City moves to dismiss the claims asserted against it.  (Doc. Nos. 13, 18.)  Doe
opposes that motion.  (Doc. Nos. 16, 19.)  For the reasons discussed below, the motion is denied.

## I.    FACTUAL BACKGROUND

Taking the allegations in the Amended Complaint as true, the relevant facts are as
follows.

### A.      Initial Investigation

On November 2, 2020, Plaintiff's adult son was shot in North Philadelphia and, later that evening, pronounced dead at Temple University Hospital.  (Doc. No. 10 at ¶¶ 23–24.)  The Philadelphia Police Department ("PPD") opened a homicide investigation into his murder and assigned former-Detective Suchinsky as the lead investigator on the case.  (*Id.* at ¶ 25.)

On November 3, Suchinsky and an unidentified male detective, who Plaintiff refers to as "Jim Doe," went to Plaintiff's mother's house to meet with Plaintiff, her mother, and her sister. (*Id.* at ¶¶ 26–28.)  At the end of that meeting, Suchinsky hugged Plaintiff, gave her his business card, and asked her to email any relevant information to his work email address.  (*Id.* at ¶ 30.)  At Suchinsky's request, Plaintiff also agreed to appear for an interview at PPD's headquarters.  (*Id.* at 31.)  Sometime after that initial meeting but before her interview, Suchinsky called Plaintiff from his work phone to say that he wanted to do "things" to her, "but he could not say what they were."  (*Id.* at ¶ 32.)

A few days later, Plaintiff went to PPD's headquarters for her interview, which was conducted by Suchinsky and Jim Doe.  (*Id.* at ¶ 34.)  At the end of the interview, Suchinsky asked Plaintiff to "take a 'selfie' and send it to him personally."  (*Id.* at ¶ 35.)  Jim Doe said nothing in response to this request.  (*Id.* at ¶ 36.)  On November 10, Suchinsky repeated his request in an email, telling Plaintiff, "SEND ME A PIC OF YOU."  (*Id.* at ¶ 40.)  "[T]o appease Detective Suchinsky and get him to leave her alone, [Plaintiff] hesitantly sent a recent picture of herself."  (*Id.* at ¶ 41.)

The next day, Suchinsky sent more questionable emails.  First, in response to Plaintiff's summary of her efforts to obtain leads and assist the investigation, Suchinsky replied, "I am going to have to Deputize you!!," followed by a police officer emoji.  (*Id.* at ¶ 43.)  About an hour later, Suchinsky sent Plaintiff a second email, this time offering to take Plaintiff on a date:

"sometime dinners [sic] on me."  (*Id.* at ¶ 44.)

**B.     The Assault**

On November 13, 2020, at around 6:30 a.m., Suchinsky asked Plaintiff to come to headquarters for a second interview to discuss her independent efforts in the investigation and to request her help facilitating an interview with her late son's girlfriend.  (*Id.* at ¶¶ 48–49.)  For reasons unknown to Plaintiff, that meeting was later cancelled.  (*Id.* at ¶ 51.)

The next morning, Suchinsky emailed Plaintiff and asked her to come in for an interview that day between 10:30 and 11:00 a.m.  (*Id.* at ¶ 52.)  When she agreed, Suchinsky replied, "LOL… TRY TO BE CLOSER TO 10:30 AM 😊."  (*Id.*)  Plaintiff arrived at headquarters around 10:30 a.m. and called Suchinsky as instructed.  (*Id.* at ¶ 57.)  Suchinsky met her at her car, carrying a note that allowed Plaintiff to park in the private, gated parking lot located behind headquarters.  (*Id.* at ¶¶ 58, 60.)  He opened the passenger door, placed the note on the dashboard, and climbed inside the car.  (*Id.* at ¶ 61.)  At his direction, Plaintiff drove around the block to access the parking lot, but while she was driving, Suchinsky reached across the car, "grabbed Jane Doe's breasts and digitally penetrated her vagina."  (*Id.* at ¶¶ 62–63.)  Terrified, Plaintiff froze until the assault was over.  (*Id.* at ¶ 64.)  Only 11 days had passed since the murder of Plaintiff's son.  (*Id.* at ¶¶ 24, 52.)

After the assault, Plaintiff parked her car in the parking lot, went inside, and was interviewed by Suchinksy, Jim Doe, and an unidentified female detective, who Plaintiff refers to as "Jen Doe."  (*Id.* at ¶ 68.)  At Plaintiff's request, Jen Doe remained in the room throughout the interview.  (*Id.* at ¶ 71.)  Plaintiff did not mention the assault to either Jim or Jen Doe, but after the interview, she asked Jim Doe if someone else could take over the case instead of Suchinsky.  (*Id.* at ¶ 73.)  According to Plaintiff, Jim Doe ignored her request.  (*Id.*)

### C.      Ongoing Harassment

In the weeks following the assault, Suchinsky continued to make inappropriate comments to Plaintiff.  (*Id.* at ¶ 74.)  Between November 2020 and February 2023, he called her almost every day and sometimes multiple times per day, often commenting on his sexual desires.  (*Id.* at ¶ 98.)

During this time, he also gave Plaintiff his personal email address, telling her, "EMAIL ME ON MY EMAIL… IF YOU WANT TO 😊" and "EMAIL ME BACK ON THE OTHER EMAIL I SENT YOU. 😊."  (*Id.* at ¶¶ 78–79.)  Suchinsky then proceeded to send numerous emails to Plaintiff from his personal email address, "referring to her as 'sweetie,'" asking Plaintiff to "hang out" or "relax" with him, and asking her to send him pictures of herself.  (*Id.* at ¶¶ 80–81.)  Plaintiff provides examples of these emails in her Amended Complaint:

> Undated:  "you and i can get together but in a different setting other than work and we can relax and talk…we can put our heads together in a more relaxed atmosphere."
>
> December 3, 2020:  "DOING GREAT THINGS BY ASSISTING ME AND PUTTING OUT POSTERS…HOPEFULLY ALL THE TECHNICAL THINGS ON MY END PAY OFF SOMEDAY…"
>
> December 3, 2020:  "YOU NEED TO GET AWAY… WISH YOU COULD SEE ME…AND I DON'T MEAN AT WORK…"
>
> December 15, 2020:  "YOU KNOW WHAT I MEAN BY WHAT I SAID TO YOU LAST…RIGHT?"  (referring to "one of his many sexually-charged phone calls in November and December")
>
> January 20, 2021:  "HEY SERIOUSLY I WANT TO SEE YOU…SEND ME A PIC…WHAT COLOR SCRUBS YOU WEARING TODAY?"

(*Id.* at ¶¶ 83, 87, 89, 92.)  Plaintiff continually redirected Suchinsky's advances, ignoring his emails or changing the subject of the conversation when he became inappropriate.  (*Id.* at ¶¶ 84, 90.)  Throughout their interactions, she was mindful that he was the lead investigator on her

son's case and was worried that he would retaliate against her if she openly rejected or resisted him.  (*Id.* at ¶ 90.)

Suchinsky's advances continued, and on February 1, 2021, Suchinsky called Plaintiff to tell her that he wanted "to perform and receive oral sex on/from her, have sexual intercourse with her, and how he could not stop thinking about laying in bed with her."  (*Id.* at ¶ 96.)  He then sent Plaintiff an email that said, "WHAT DO YOU THINK ABOUT THAT?  NOTHING WOULD INTERFER [sic] WITH THE INVESTIGATION…I WANT TO RELAX AND CHILL WITH YOU."  (*Id.* at ¶ 97.)

In February or March 2021, Plaintiff finally ceased all communications with Suchinsky. (*Id.* at ¶ 99.)

### D.    PPD's Investigation and Suchinsky's Arrest

Not long after Plaintiff stopped talking to Suchinsky, the PPD's internal affairs unit opened an investigation into his conduct.  (*Id.* at ¶ 100.)[1]  Suchinsky was placed on desk duty and later suspended with intent to dismiss.  (*Id.* at ¶ 134.)  At the end of the investigation, internal affairs referred the case to the District Attorney's Office for criminal prosecution and the PPD officially fired Suchinsky.  (*Id.* at ¶ 135.)

On February 23, 2023, Suchinsky was arrested for his conduct toward Plaintiff and charged with aggravated indecent assault without consent (18 Pa. Stat & Cons. Stat § 3125), criminal use of communication facility (*id.* § 7512), indecent assault by forcible compulsion (*id.* § 3126(a)(2)), stalking (*id.* § 2709.1(a)(1)), indecent assault without consent of other (*id.* §3126(a)(1)), official oppression (*id.* § 5301(1)), and harassment (*id.* § 2709(a)(4)).  (Doc. No. 10 at ¶ 101.)  An Assistant District Attorney working that case has publicly commented that

---

[1] The Complaint does not explain what prompted the investigation.

Detective Suchinsky likely victimized other women.  (*Id.* at ¶ 17.)

### E.    This Lawsuit

Plaintiff filed this case on January 27, 2023, against the City of Philadelphia, Suchinsky, and the Doe supervisors and detectives, who she alleges knew that Suchinsky had previously engaged in sexual misconduct and ignored the warning signs in Plaintiff's case, allowing Suchinsky to harass and assault her.  (Doc. Nos. 1, 10.)  Plaintiff sues all Defendants under 42 U.S.C. § 1983.  (*Id.* at ¶¶ 151–201 (Counts I–IV).)  Specifically, she asserts a claim for "state-created danger/violation of bodily integrity" against the Doe Defendants and Suchinsky.  (*Id.* at ¶¶ 151– 175 (Count I).)  She asserts municipal liability claims against the City based on municipal policy, practice, or custom (*id.* at ¶¶ 176–184 (Count II)) and failure to train (*id.* at ¶¶ 185–193 (Count III)).  Finally, Plaintiff asserts a § 1983 claim for supervisory liability against the Doe supervisors.  (*Id.* at ¶¶ 194–201 (Count IV).)  In addition to her § 1983 claims, Plaintiff brings state law claims of assault, battery, and IIED against Suchinsky.  (*Id.* at ¶¶ 202–23 (Counts V–VII).)

The City moves to dismiss the claims asserted against it in Counts II and III under Federal Rule of Civil Procedure 12(b)(6), arguing that those claims fail because the underlying constitutional conduct is barred by the relevant statute of limitations, Plaintiff has failed to state a claim under the state created danger doctrine against the Doe Defendants, and Plaintiff has failed to state a claim for municipal liability.  (Doc. Nos. 13, 18.)  Plaintiff opposes that motion.  (Doc. Nos. 16, 19.)  The Court held oral argument on these issues on August 1, 2023.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*  "The District Court, in deciding a motion

under Fed.R.Civ.P. 12(b)(6), [i]s required to accept as true all factual allegations in the complaint

and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."

*Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  Affirmative defenses,

including a statute of limitations defense, may be raised by a motion under Rule 12(b)(6) only if

the defense's applicability is "apparent on the face of the complaint."  *Schmidt v. Skolas*, 770

F.3d 241, 249 (3d Cir. 2014) (quotation marks omitted); *see also PG Publ'g, Inc. v. Newspaper

Guild of Pittsburgh*, 19 F.4th 308, 318 n.13 (3d Cir. 2021) ("Generally, a statute of limitations

defense cannot be raised under Rule 12," however, the Third Circuit has found such a motion

permissible "if the time alleged in the statement of a claim shows that the cause of action has not

been brought within the statute of limitations." (quotation marks omitted)); *Brody v. Hankin*, 145

F. App'x 768, 771 (3d Cir. 2005) ("[A]n affirmative defense will serve as grounds for a Rule

12(b)(6) dismissal only if the basis for the defense is evident on the face of the complaint.").

**III.    DISCUSSION**

As stated above, the City argues that the claims asserted against it fail because the

underlying constitutional claim is barred by the relevant statute of limitations and Plaintiff has

failed to state a claim premised on the state created danger doctrine.  (Doc. No. 13.)  In the

alternative, the City argues that Plaintiff has failed to state a claim for municipal liability under

the *Monell* doctrine.  (*Id.*)  The Court addresses each issue in turn.

**A.    Statute of Limitations**

First, the City argues that the § 1983 claims asserted against it fail because Plaintiff's

bodily integrity claim against Suchinsky, which serves as the basis for Plaintiff's claims against

the Doe Defendants and the City, is barred by the relevant statute of limitations.

"[T]he appropriate limitation period for § 1983 actions brought in Pennsylvania is the two-year limitation" period governing personal injury actions.  *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985); *see also Bennett v. Susquehanna Cnty. Children & Youth Servs.*, 592 F. App'x 81, 83 (3d Cir. 2014) ("The limitations period for a § 1983 action is the limitations period for personal injury torts in the state where the cause of action arose.  Pennsylvania, which is where Bennett's cause of action arose, has a two-year statute of limitations." (citations omitted)).  Although state law sets the applicable period and governs tolling of that period, federal law governs the accrual of § 1983 claims.  *Buchholz*, 128 F. App'x at 894; *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 235 (3d Cir. 2014) ("The date of the claim's accrual, however, continues to be governed by federal law, although state law generally governs tolling and its effects." (citations omitted)).  "The limitations period begins to run from the time when 'the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action.'"  *Buchholz*, 128 F. App'x at 894.

Here, the City argues that Plaintiff's claims against it were filed outside of this period because Suchinsky assaulted her on November 14, 2020 and Plaintiff did not file this action until January 27, 2023, more than two years later.  (Doc. No. 13 at 7–8.)  Plaintiff does not dispute that the assault occurred outside of the applicable limitations period.  Instead, Plaintiff argues that her bodily integrity claim "is premised on the totality of physical *and* continuous psychological misconduct" by Suchinsky, which continued into February 2021.  (Doc. No. 16 at 7 n.4, 9.)[2]  She reasons that because Suchinsky engaged in continuous harassment throughout

---

[2] Plaintiff notes that "[i]n addition to her bodily integrity claim, [she] states a 14th Amendment claim under the state created danger doctrine."  (Doc. No. 16 at 19.)  That doctrine represents one theory under which a plaintiff can assert a claim for violation of their right to bodily integrity.  *See Keener v. Hribal*, 351 F. Supp. 3d 956, n.6 (W.D. Pa. 2018) (describing the "state created danger theory" as the means by which a plaintiff asserts "a viable constitutional claim" for "[d]eprivation of bodily integrity"); *see also Dorley v. S. Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 232 (W.D. Pa. 2015) (finding "no

this period, the Court may consider his earlier harassment and assault under the continuing violation doctrine. (*Id.* at 11–16.)

The continuing violation doctrine "operates as an equitable exception to the timely filing requirement." *Buchholz*, 128 F. App'x at 894 (quotation marks omitted); *Wilson v. U.S. Postal Serv.*, 814 F. App'x 719, 721 (3d Cir. 2020) ("Exhaustion requirements . . . are subject to equitable exceptions, such as the continuing violation doctrine."). Under that doctrine, "a federal cause of action based upon the defendant's continuing conduct is timely if the last act evidencing that continuing practice falls within the appropriate limitations period." *Buchholz*, 128 F. App'x at 894; *Tearpock-Martini*, 756 F.3d at 236 ("In brief, the rule provides that when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." (quotations omitted)).

The Third Circuit has described the doctrine's reach as "understandably narrow," noting that it often applies "in employment discrimination cases, where only in retrospect will a plaintiff recognize that seemingly unconnected incidents were, in fact, part and parcel of a larger discriminatory pattern." *Tearpock-Martini*, 756 F.3d at 236. "[E]quitable relief from the statutory limitations period is appropriate only where the alleged violation is 'occasioned by continual unlawful acts, not continual ill effects from an original violation.'" *Tearpock-Martini*, 756 F.3d at 236 (quoting *Cowell*, 263 F.3d at 293).

"To establish a continuing violation, the plaintiff must demonstrate that: (1) there was at

---

analytical distinction between the plaintiff's bodily integrity claims and state-created danger claims "because the state-created danger doctrine is one theory used to assert a claim for harm to one's bodily integrity"). Accordingly, in analyzing the City's statute of limitations concerns, the Court focuses on the underlying claim that Plaintiff's right to bodily integrity was violated by Suchinsky's course of sexual misconduct. The Court discusses the City's argument that Plaintiff cannot pursue that violation under the state created danger doctrine below.

least one violation during the statutory period; and (2) that the defendant's actions were 'more than the occurrence of isolated or sporadic acts . . . .'" *Soppick v. Borough of W. Conshohocken*, 118 F. App'x 631, 635 (3d Cir. 2004) (quoting *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)).  To determine whether a defendant's actions are part of a continuing practice under the second element, courts consider:  "(1) whether the violations were related in subject matter and (2) whether the acts were recurring." *Bennett*, 592 F. App'x at 84; *see also id.* at 84 n.3 (explaining that "under *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013), there is no longer a permanency requirement under the continuing violations doctrine"); *Cibula*, 570 F. App'x at 135 ("To determine whether a practice was continual, we consider (1) whether the violations are part of the same subject matter and (2) whether the violations occurred frequently.  A plaintiff must also point to an affirmative act that took place within the limitations period for the continuing violations doctrine to apply." (citations omitted)).

The City argues that the continuing violation doctrine cannot save Plaintiff's claims in this instance because "the November 14, 2020 sexual assault was an actionable injury that Plaintiff was aware of on the date of the occurrence," and is therefore distinguishable from those cases where the "injury or illegality of a defendant's conduct only become apparent over an extended period of time."  (Doc. No. 18 at 2 (quotation marks omitted).)  The City then argues that Plaintiff cannot rely on the harassment that occurred during the limitations period to support her bodily integrity claim because "sexual harassment is not actionable as a violation of bodily integrity."  (*Id.* at 3.)  Plaintiff strongly disagrees with this characterization, arguing that "non-physical types of harassment, including verbal abuse, are subject to the 'shocks the conscience' analysis" that governs substantive due process claims.  (Doc. No. 19 at 1.)  Given the parties' disagreement, the Court analyzes the parameters of the right to bodily integrity before turning to

the applicability of the continuing violations doctrine in this case.

    **1.**    <u>**Right to Bodily Integrity**</u>

"The Fourteenth Amendment prohibits any state deprivation of life, liberty, or property without due process of law."  *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).  "Among the historic liberties so protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security."  *Id.* at 673; *see also Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) (discussing right to be free from unjustified intrusions on personal security and from bodily restraint); *Black ex rel. Black v. Ind. Area Sch. Dist.*, 985 F.2d 707, 709 n.1 (3d Cir. 1993) ("Plaintiffs have a liberty interest in their bodily integrity that is protected by the Fourteenth Amendment.").  This includes the right "to freedom from invasion of [one's] personal security through sexual abuse."  *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989).

The parties agree that Suchinsky's assault of Plaintiff clearly violated that right.  *See id.* at 727 (describing the "'contours' of a student's right to bodily integrity" as including "a student's right to be free from sexual assaults by his or her teachers"); *see also Rogers v. City of Little Rock*, 152 F. 3d 790, 797 (8th Cir. 1998) (finding a police officer's "sexual assault of [the plaintiff] was a violation of the most of intimate kind of bodily integrity").  They disagree, however, about whether the harassment before and after the assault also fall within the parameters of Plaintiff's bodily integrity claim.

Courts of appeals in other circuits have described violations of bodily integrity as requiring a "serious battery."  *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) ("The liberty protected by [the Due Process Clause of the Fourteenth Amendment] includes bodily integrity, and is infringed by a serious, as distinct from a nominal or trivial, battery. . . .  Rape, however, is not only a battery, but a very serious battery, and a rape committed under color of

state law is therefore actionable under 42 U.S.C. § 1983 as a deprivation of liberty without due process of law." (internal citations omitted)); *see also Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257–58 (10th Cir. 1996) ("Sexual assault or molestation by a school teacher violates a student's substantive due process rights," amounting to an "intrusion of the student's bodily integrity. . . .  We have found no case in a school context that held conduct falling shy of sexual molestation or assault constitutes constitutionally actionable sexual harassment.").  The Third Circuit, however, explicitly rejected the Seventh Circuit's battery-focused view of the right to bodily integrity in 2018.  *See Kane v. Barger*, 902 F.3d 185, 193 (3d Cir. 2018) (rejecting the defendant's argument that plaintiff's "substantive due process claim fails because he did not 'commit a serious battery that shocks the conscience'").[3]

*Kane* is instructive.  In that case, the plaintiff went to the hospital to report a suspected sexual assault.  *Id.* at 187.  The officer assigned to investigate her claim met her at the hospital and asked the plaintiff to bring her clothes to the police station the next day.  *Id.* at 188.  When she arrived at the station, the officer took her to a back room alone and "used his personal cell phone to photograph intimate areas of [her] body."  *Id.*  During the encounter, he touched her twice without permission, once to pull her shorts down to take a better photograph of a bruise on her butt, and a second time to pull her shirt down to take a photograph of a bruise on her upper chest. *Id.*  "[W]hile photographing her," the officer also "repeatedly asked about her breasts, vagina, and buttocks," to the point that the plaintiff felt it necessary "to expose her vagina to

---

[3] Because the Third Circuit's view of the right to bodily integrity is broader than a claim for battery, the Court does not find persuasive earlier district court opinions from this Circuit that found sexual harassment was insufficient to extend a statute of limitations for battery.  *See, e.g.*, *Brillhart v. Sharp*, 4:CV-07-1121, 2008 WL 2857713, at *6–7 (M.D. Pa. July 21, 2008) (finding "the continuing violations theory does not save Brillhart's battery claim" where the harmful or offensive touching occurred outside of the limitations period, despite the fact that within the limitations period, the defendant engaged in "pervasive" sexual harassment).

him." *Id.* After the encounter, the officer "failed to document the clothing evidence that [she] provided," and when questioned by his superiors about the existence of the photographs, "he gave inconsistent accounts of his behavior." *Id.*

The plaintiff filed suit, claiming that the officer violated her substantive due process right to bodily integrity. The Third Circuit explained that to show a violation of the right to substantive due process, a plaintiff must "establish that 'the particular interest at issue is protected by the substantive due process clause,' and that 'the government's deprivation of that protected interest shocks the conscience.'" *Id.* at 192 (quoting *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)). As to the first element, the court noted that "individuals have a constitutional liberty interest in personal integrity that is protected by the Due Process Clause of the Fourteenth Amendment" and that "the liberty specially protected by the Due Process Clause includes the right to bodily integrity." *Id.* (cleaned up). As to the second element, the Court reasoned that "the culpability required for behavior to shock the conscience largely depends on the context in which the action takes place." *Id.* (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 246 (3d Cir. 2016)). "[W]here deliberation is possible and officials have time to make unhurried judgments, deliberate indifference is sufficient." *Id.* (quoting *L.R.*, 836 F.3d at 246). In this context, deliberate indifference "requires 'a conscious disregard of a substantial risk of serious harm.'" *Id.* (quoting *L.R.*, 836 F.3d at 246).

Applying this standard, the Third Circuit concluded that the officer's conduct, before and after his encounter with the plaintiff, was "conscience-shocking":

> Altogether, the record—again, viewed in the light most favorable to
> [the plaintiff]—supports the inference that [the officer] acted for his
> own personal gratification, rather than investigative ends, in both
> touching [the plaintiff, a suspected victim of sexual assault,] and
> photographing her intimate bodily areas with his personal cell phone
> in violation of department policy. That is conscience-shocking

> behavior.  Thus, [the officer] violated [the plaintiff's] right to bodily
> integrity.

*Id.* at 193–94; *cf. Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016) (analyzing whether a school teacher's purely verbal harassment of second grade student violated student's substantive due process rights under "shocks the conscience" test); *S.M. Lakeland Sch. Dist.*, 148 F. Supp. 2d 542, 547 (M.D. Pa. 2001) ("Non-physical types of harassment, including verbal abuse, require the same 'shock the conscience' analysis.").

Here, as in *Kane*, Plaintiff's allegations, if true, show that Suchinsky's conduct amounts to a "a conscious disregard of a substantial risk of serious harm.'" *Id.* at 293 (quoting *L.R.*, 836 F.3d at 246).  Within days of the murder of Plaintiff's son, Suchinsky—the lead detective investigating his homicide—began an ongoing campaign of sexual harassment against Plaintiff.  Not long after first harassing her, he physically assaulted her in a department parking lot before interviewing her in connection with her son's homicide.  Over the next few months, he called and emailed her *daily* from his work and personal emails to comment on her body, make crude sexual remarks about her, and ask her out on dates, all while hinting that any push back from her could negatively affect his investigation of her son's murder.

Contrary to the City's argument, the Court cannot find as a matter of law that the violation of bodily integrity began and ended with the November assault.  Although the assault could have, on its own, supported a violation of Plaintiff's rights, Plaintiff's allegations show that Suchinsky's conscience-shocking conduct continued in the months that followed.  Viewing the facts in the light most favorable to Plaintiff and considering the totality of the circumstances, the Court finds that she has at least stated a claim for violation of her substantive due process rights based on Suchinsky's ongoing conduct.  *See Kane*, 902 F.3d at 193–94; *cf. Haberthur v. City of Raymore*, 119 F.3d 720, 724 (8th Cir. 1997) ("The conduct that Haberthur alleged in her

complaint, that Untrif reached his hand underneath her shirt and fondled a private erogenous area and moved his hands along and caressed her body while making sexually suggestive remarks, was intrusive, demeaning, and violative of her personal integrity.  The implication for further sexual contact was in the larger context of threatening adverse official action by way of a ticket and following her in his police car. He was in uniform and on duty throughout.  This is not a case alleging that a state actor failed to prevent a sexual assault, but one where the state actor is the alleged perpetrator.  Taking the allegations in Haberthur's complaint as true, as we must in determining whether her complaint stated a claim, they sufficiently allege deprivation of her substantive due process rights." (internal citations omitted)).

In short, the relevant violation is Suchinsky's course of sexual abuse, including the daily sexual harassment and the November sexual assault, all of which occurred in the context of his official investigation into the murder of Plaintiff's son.

## 2.    Continuing Violation Doctrine

Having defined the appropriate scope of Plaintiff's claims, the Court now addresses whether Plaintiff can rely on conduct, including the assault and initial harassment, which falls outside of the limitations period.

As stated above, "[t]o establish a continuing violation, the plaintiff must demonstrate that:  (1) there was at least one violation during the statutory period; and (2) that the defendant's actions were 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'" *Soppick*, 118 F. App'x at 635 (quoting *West*, 45 F.3d at 754).[4]  Plaintiff

---

[4] The City argues that the Court should not reach this test because Plaintiff knew she had a cause of action when she was assaulted in November 2019, and therefore, the continuing violation doctrine is foreclosed as a matter of law.  *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003) (noting that the continuing violation theory "does not apply when plaintiffs are aware of the injury at the time it occurred").  But, as discussed above, although Suchinsky's assault of Plaintiff, on its own, amounted to a violation of Plaintiff's right to bodily integrity, Plaintiff's

satisfies both requirements.

First, Plaintiff identifies at least one violation since January 27, 2021.  She alleges that Suchinsky called or emailed her daily, up until at least February 1, 2021, when he called to tell her that he wanted "to perform and receive oral sex on/from her, have sexual intercourse with her, and how he could not stop thinking about laying in bed with her."  (Doc. No. 10 at ¶ 96.) Later that day, Suchinsky also sent Plaintiff an email that reiterated his sexual requests and his position of power:  "WHAT DO YOU THINK ABOUT THAT?  NOTHING WOULD INTERFER [sic] WITH THE INVESTIGATION…I WANT TO RELAX AND CHILL WITH YOU."  (*Id.* at ¶ 97.)  Accordingly, Plaintiff has identified at least one act that occurred during the statutory period and satisfied the first element of the continuing violation test.

---

claim here is that Suchinsky's entire course of conduct from November 2019 through January 2020 violated her due process rights.  In this way, Plaintiff's claim resembles an employment discrimination claim for hostile work environment.  *See Vandegrift v. City of Philadelphia*, 228 F. Supp.3d 464, 483 (E.D. Pa. 2017) (describing "a hostile work environment claim" as being "composed of a series of separate acts" of harassment "that collectively constitute one unlawful employment practice" (quotation marks omitted)); *Hague v. Alex E. Paris Contracting Co.*, No. 2:14cv655, 2016 WL 5468118 at *5 (W.D. Pa. Sept. 29, 2016) ("Defendant believes that because the rape of Ms. Hague at the hands of Mr. Fisher was arguably sufficient on its own to demonstrate severe or pervasive conduct, that it could not also be characterized as a component of an ongoing unlawful employment practice.  However, hostile work environment claims are different from discrete acts. . . .  A determination of the severe or pervasive nature of alleged harassment requires the Court to consider the totality of the circumstances . . . ." (cleaned up)).

In the discrimination context, courts in this Circuit have held that a sexual assault can "be aggregated under the continuing violation doctrine along with less severe acts of harassment." *Vandegrift*, 228 F. Supp. 3d at 485 ("Rather than focusing our inquiry on whether an individual act of harassment is so severe as to constitute a discrete act, we instead focus on whether the act of harassment constitutes part of a pattern of harassment constituting one unlawful employment practice.  Under this inquiry, it does not matter whether the 2007 sexual assault is actionable on its own." (cleaned up)); *Hague*, 2016 WL 5468118 at *5 ("While the rape may have been sufficient, alone, to meet the requirements of a hostile work environment claim, Mr. Fisher's conduct—when viewed in the light most favorable to the non-moving party—clearly suggests a persistent, ongoing pattern characteristic of a continuing violation. . . .  The subsequent unwelcome sexual assaults and harassment occurring within the 300 day period make the rape and all other conduct occurring prior to December 22, 2012 part of the whole for purposes of the hostile work environment claim.  Thus, the continuing violation doctrine precludes exclusion of evidence of Mr. Fisher's conduct occurring prior to December 22, 2012." (cleaned up)).  The Court is persuaded by the reasoning in *Vandegrift* and *Hague*, and thus, considers Plaintiff's allegations under the continuing violation doctrine factors.

As for the second element, the Court must consider "(1) whether the violations [within and outside of the relevant limitations period] were related in subject matter and (2) whether the acts were recurring." *Bennett*, 592 F. App'x at 84.  Again, Plaintiff alleges that Suchinsky made comments about Plaintiff's body, asked to have sex with her, and described the sex acts he would like to perform with her *on a daily basis*.  At one point, Suchinsky acted on these desires and assaulted Plaintiff in her car.  The harassment and assault all occurred while Suchinsky was the lead detective on the investigation of the murder of Plaintiff's son, and thus, while he stood in a position of power over Plaintiff.  These allegations show that Suchinsky's conduct amounts to "more than 'the occurrence of isolated or sporadic acts.'"  *Soppick*, 118 F. App'x at 635 (quoting *West*, 45 F.3d at 754).  The second element is also satisfied.

Viewing the allegations in the light most favorable to Plaintiff, the continuing violation doctrine is applicable.  *See Wright v. O'Hara*, No. CIV.A. 00–1557, 2002 WL 1870479, at *4 (E.D. Pa. Aug. 14, 2002) ("In the present case, it appears that plaintiff may use the continuing violation doctrine to bring his section 1983 claim against Officer Jamison.  Although the continuing violations doctrine is most frequently applied in employment discrimination claims, it may also be used to bring a section 1983 claim.  First, all of plaintiff's allegations against Officer Jamison seem to constitute harassment in one form or another.  Plaintiff claims Jamison sexually assaulted him, threatened him with death, and attempted to incite other inmates to attack him over the course of at least two years.  Plaintiff's repeated written complaints to Vaughn over the course of those two years demonstrate the on-going nature of the alleged harassment.  Moreover, the repeated letters to Vaughn show plaintiff's awareness of and willingness to assert his rights against Jamison.  Finally, the last of these letters complaining about Jamison's continuous harassment, dated January 29, 2000, clearly falls within the statute of limitations.").

At this stage, the Court cannot say that the statute of limitations defense's applicability is apparent on the face of the Amended Complaint. *See Schmidt*, 770 F.3d at 249. The motion to dismiss on statute of limitations grounds is denied. If appropriate, the City may raise the issue again at summary judgment.

**B.  State Created Danger Doctrine**

Next, the City argues that the claims asserted against it fail to the extent they are based on the actions of the Doe Defendants because although "Plaintiff plausibly pleads a constitutional claim premised upon a theory of violation of bodily integrity" against Suchinsky, she has not stated a claim for violation of that right as against the Doe Defendants under the state created danger doctrine. (Doc. No. 13 at 8–11.)

Under the state created danger doctrine, a plaintiff brings a claim for violation of the right to bodily integrity against a state actor who did not directly violate the plaintiff's rights, but whose actions nevertheless placed the plaintiff in a dangerous position that increased the likelihood that the plaintiff's rights would be violated. *See Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996) (considering whether the "police officers affirmatively placed Samantha in a position of danger"). The doctrine recognizes that although "the Due Process Clause imposes no affirmative duty [on the state] to protect a citizen who is not in state custody," a constitutional violation can still occur "when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003)). To state a meritorious claim under the state created danger doctrine, the plaintiff must allege:

> (1)  the harm ultimately caused was foreseeable and fairly direct;
>
> (2)  a state actor acted with a degree of culpability that shocks

the conscience;

(3)     a relationship between the state and the plaintiff existed such
        that the plaintiff was a foreseeable victim of the defendant's
        acts or a member of a discrete class of persons subjected to
        the potential harm brought about by the state's actions, as
        opposed to a member of the public in general; and

(4)     a state actor affirmatively used his or her authority in a way
        that created a danger to the citizen or that rendered the citizen
        more vulnerable to danger than had the state not acted at all.

*Id.* (quotation marks omitted); *accord Johnson v. City of Philadelphia*, 975 F.3d 394, 400 (3d

Cir. 2020).  Here, the City argues that Plaintiff's claim fails under elements one and four.  (Doc.

No. 13 at 9.)

        As to the first element, the City argues that "Plaintiff cannot establish that the harm she

suffered—being sexually assaulted by an on-duty officer—was foreseeable" because "there are

no facts alleged that lead to a plausible inference" that the Doe Defendants "could foresee that

one of [the PPD's] employees, with no known violent or sexually assaultive history, would

sexually assault the Plaintiff."  (*Id.*)  This argument misreads the allegations in the Amended

Complaint.  Contrary to the City's argument, Plaintiff *does* allege that Suchinsky had a history of

sexually assaulting women involved in his investigations and that Suchinsky's supervisors and

coworkers were aware of that prior misconduct.  (*See* Doc. No. 10 at ¶ 17 ("ADA Lyandra

Retacco, supervisor of the DAO Special Investigations Unit, recently commented publicly that

Detective Suchinsky likely victimized other women."); *id.* at ¶ 157 ("At all relevant times, [the

Doe Defendants] were aware of prior sexual misconduct by Detective Suchinsky directed to

female witnesses, victims, informants, and other citizens who were subjects of or involved with

criminal investigations like the one Detective Suchinsky was assigned to in this case."); *see also*

*id.* at ¶¶ 14, 130, 136, 140, 143, 155, 156, 158.)  Taking these allegations as true, as the Court

must at this stage, Plaintiff has plausibly alleged that the harm she suffered at the hands of

Suchinsky was foreseeable.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008) ("To adequately plead foreseeability then, we require a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."); *see also D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 624–25 (M.D. Pa. 2009) ("Plaintiffs allege that Snyder and Watts knew Fernsler was viewing child pornography, knew that he was applying to become a foster parent, and knew that he had a history of domestic violence. . . .  Cognizant of Fernsler's intentions, it was reasonably foreseeable that covering up Fernsler's crime would lead to future child abuse, especially given the ready access to children that naturally accompanies a position as a foster parent.").  *Contra. Harris v. Paige*, Civil Action No. 08–2126, 2011 WL 1755646, at *7–8 (E.D. Pa. May 9, 2011) (finding first element of the state created danger doctrine not satisfied because the officer's disciplinary record was "devoid of any sexual assaults or even sexual misconduct," and therefore, "it was not foreseeable on the part of the City that he would commit on duty the [sexual assault for] which he is now accused").

In the alternative, the City argues that Plaintiff's claim fails under the fourth element because she has not alleged that the Doe Defendants used their authority to place Plaintiff in a dangerous situation or render her more vulnerable to attack by Suchinsky.  Specifically, the City takes issue with Plaintiff's claim to the extent it is based on the Doe supervisors' "failure to supervise or train Defendant Suchinsky" because [s]uch a characterization of the City's failings is merely an 'attempt to redefine clearly passive inaction as affirmative acts[,]' which is insufficient to survive a motion to dismiss."  (Doc. No. 13 at 11 (quoting *Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013)).

Although "liability 'under the state-created danger theory can only be predicated upon the

20

state's affirmative acts,'" the line "between action and inaction is sometimes difficult to draw."

*Bright*, 443 F.3d at 282 n.6; *see also Johnson*, 975 F.3d at 400–01 ("True, we have noted the

inherent difficulty in drawing a line between an affirmative act and a failure to act, and

sometimes frame the inquiry as asking whether a defendant's exercise of authority resulted in a

departure from the status quo.  But we have repeatedly held that an alleged failure *to do*

*something*, standing alone, cannot be the basis for a state-created danger claim." (quotation

marks omitted)).  The "dispositive factor" under this element is "whether the state has in some

way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act

was more appropriately characterized as an affirmative act or an omission."  *Morse v. Lower*

*Merion Sch. Dist.*, 132 F.3d 902, 915 (3d Cir .1997).

At this early stage of the litigation, the Court finds that Plaintiff has sufficiently alleged

the Doe Defendants "placed [her] in a dangerous position that was foreseeable."  *Id.*  Notably,

Plaintiff alleges that the Doe supervisors placed her at risk of being sexually victimized by

Suchinsky because they made Suchinsky the lead detective for the investigation despite knowing

that Suchinsky had engaged in sexual misconduct during previous investigations.  (*See* Doc. No.

10 at ¶¶ 14, 16, 17, 20–22, 130–32, 136, 143, 155–58.)  Indeed, Plaintiff alleges that despite his

history and a history of sexual misconduct by other officers, the Doe supervisors allowed

Suchinsky to take on the lead investigator role with minimal oversight and without training his

fellow PPD officers on how to recognize and report sexual misconduct.  (*Id.* at ¶¶ 130, 155–58,

187–93.)  Finally, Plaintiff alleges that Jim Doe saw Suchinsky act inappropriately toward her

but failed to intercede or report his transgressions and later ignored her request that a new

investigator take Suchinsky's place.  (*Id.* at ¶¶ 36, 39, 73.)  *Cf. Gremo*, 363 F. Supp. 2d at 789

("In the present case, the failure of some of the defendants to take appropriate steps to address

the violence [of other students] and monitor unsafe common areas placed Gremo in a more
dangerous position.  Also, the acts of concealment by all defendants made Gremo more
vulnerable to the danger of attack, because those acts could have had the effect of encouraging
the perpetrators.").

Although a close call, the Court finds these allegations are sufficient at the motion to
dismiss stage.  *See Leighliter*, 2018 WL 6812496, at *7–8 ("As the Court understands it, Plaintiff
avers that the lack of policy, regulation or oversight of the use of juvenile and female informants
is the state-created danger alleged.  Without such policies, Plaintiff—a 15-year-old girl—was
used by the police in controlled criminal activity and placed in situations that allowed her to be
targeted for sexual misconduct [by a police officer with a known history of engaging in sexual
misconduct]. . . .  Regarding the final element, giving Plaintiff the benefit of the doubt, the Court
cannot say as a matter of law that [the chief of police], and therefore the City, did not act
affirmatively to create a danger to Plaintiff."); *cf. Hayes v. Erie Cnty. Office of Children &
Youth*, 497 F. Supp. 2d 684, (W.D. Pa. 2007) ("Plaintiffs alleged that OCY played an *affirmative*
role in removing Brittany from her natural home and placing her with Iarussi, thus rendering
Brittany vulnerable to the abuse she later suffered at Iarussi's hands. . . .  This allegation, coupled
with the averment that the agency and its employees effectively ignored repeated reports of
suspected abuse within the home is sufficient to establish a Fourteenth Amendment claim under
the state-created danger theory."); *Enright v. Springfield Sch. Dist.*, Civil Action No. 04-CV-
1653, 2007 WL 4570970, at *9 (E.D. Pa. Dec. 27, 2007) (concluding that "the jury's verdict
must likewise stand under the state-created danger theory" because the "plaintiffs produced
evidence that it was the School District's unilateral decision to transport Cassia [a primary school
girl] with high-school age boys, one of whom it clearly knew had a history of socially

inappropriate and sometimes violent behavior.  By so doing, the School District could be found to have affirmatively used its authority in such a manner that it rendered the child more vulnerable to danger than had it not acted").

The Doe supervisors' knowledge of Suchinsky's prior misconduct, the extent to which they oversaw Suchinsky's investigation, the steps that Jim and Jen Doe took to report Suchinsky's improper advances, and the knowledge and training provided to PPD employees, like Jim Doe, on recognizing and reporting sexual misconduct are all issues more properly explored in discovery.  *See D.N. ex rel. Nelson*, 608 F. Supp. 2d at 627 ("Plaintiffs' complaint avers affirmative government misconduct, which placed D.N. and S.N. in foreseeable danger. The specific scope of defendants' conduct—and alleged concealment of Fernsler's crime—is more properly explored in discovery.  The court finds that plaintiffs' allegations of a state-created danger are sufficient at this stage to withstand defendants' Rule 12(b)(6) challenge."); *Leighliter*, 2018 WL 6812496, at *8 ("To survive summary judgment however, Plaintiff must make clear which actions, rather than any alleged inactions, of the City of Connellsville and [the chief of police] created the danger to her.").[5]

---

[5] The City also suggests that Plaintiff's claim fails because a "state created danger claim is a narrowly tailored and unique claim that arises not from injury directly caused by a state actor, as with a claim for sexual assault, but rather when a state actor takes affirmative action under special circumstances which facilitates the injury—most commonly at the hands of a third-party."  (Doc. No. 13 at 9–10.)  The Court agrees that the circumstances of this case place it outside the norm of state created danger claims, which are typically premised on the actions of a third party, private actor.  *See, e.g.*, *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997) (describing state created danger doctrine as an exception to "the general rule . . . that the state has no affirmative obligation to protect its citizens from the violent acts of private individuals," in a case where the "plaintiff alleged [the municipal] defendants subjected [her] to a dangerous and ultimately fatal situation, in violation of her Fourteenth Amendment right to substantive due process, by allowing a mentally deranged and homicidal third party to have access to the day care center where [she] worked").  However, the City cites no cases, and the Court has found none, which foreclose § 1983 claims premised on the state created danger doctrine where the underlying harm is caused by a state actor as opposed to a private party.  To the contrary, the few courts that have considered such a claim have analyzed it under the traditional rubric for state created danger claims.  *See, e.g.*, *M.T. ex rel. Amber H. v. Uniontown Area Sch. Dist.*, Civil No. 20-614, 2021 WL 807713, at *3–5 (W.D. Pa. Mar. 3, 2021); *Leighliter v. City of Connellsville*, 2018 WL 6812496, at *7–8

The motion to dismiss is denied on this ground as well.

### C.      Municipal Liability

Last, the City argues that even if Plaintiff's underlying bodily integrity and state created

danger claims survive, Counts II and III should be dismissed because Plaintiff has failed to state

a claim for municipal liability.

Local governments and municipalities are considered persons under § 1983 and may be

sued directly under that section when "the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690

(1978). "[A] government entity may not be held vicariously liable under § 1983 for the acts of

its employees under a respondeat superior theory of liability." *Winn & Sons, Inc.*, 162 F. Supp.

3d at 459 (citing *Monell*, 436 U.S. at 691). "Instead, it is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy, inflicts the injury that the government as an entity is responsible

under § 1983." *Monell*, 436 U.S. at 694; *see also Mulholland v. County of Berks*, 706 F.3d 227,

237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can

only be liable when the alleged constitutional transgression implements or executes a policy,

regulation, or decision officially adopted by the governing body or informally adopted by

custom." (quotation marks omitted)); *see also City of Canton v. Harris*, 489 U.S. 378, 385

(1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself*

causes the constitutional violation at issue.").

Courts have recognized two avenues to municipal liability under *Monell*. "A plaintiff

_____

(W.D. Pa. Dec. 27, 2018).

may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations omitted); *Benson v. Delaware County*, CIVIL ACTION NO. 21-2854, 2022 WL 784475, at *3 (E.D. Pa. Mar. 15, 2022). Plaintiff pursues both avenues here.

### 1.    <u>Policy, Custom, or Practice (Count II)</u>

To survive a motion to dismiss a claim premised on municipal policy or custom, a plaintiff must "identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984); *Brown*, 50 U.S. at 407–08 (explaining that the policy or custom must be the "moving force" behind the plaintiff's alleged injury). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland*, 706 F.3d at 237 (quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." *Id.* (quotation marks omitted); *see also McTernan v. City of York*, 564 F.3d 636, 658–59 (3d Cir. 2009) (explaining that to state a municipal custom, the complaint must "specify what exactly that custom or policy was" and demonstrate "knowledge and acquiescence by the decisionmaker").

In Count II, Plaintiff argues that Suchinsky's conduct is part of a City practice or custom "of allowing officers, detectives, and agents of the [Department], like Detective Suchinsky, to use the police badge as a means of exercising control over and manipulating control over persons with whom they came into contact." (Doc. No. 10 at ¶ 178.) She also alleges that the City has a "widespread culture" of "authorizing and/or acquiescing sexual misconduct." (*Id.* at ¶ 180.)

Plaintiff then provides a litany of City customs that she claims led to the harm that she suffered:

> (a) A custom, policy and practice of allowing private arrangements and/or favors exchanged between investigating officers, detectives, witnesses, and victims;
>
> (b) A custom, policy and practice of allowing investigating officers and/or detectives to perform their duties with partiality to certain individuals;
>
> (c) A custom, policy and practice of allowing investigating officers and/or detectives to spend disproportionate time interacting with particular individuals without proper supervision, documentation, or oversight relative to the investigative activity taking place;
>
> (d) A custom, policy and practice of ignoring, failing to report, and/or downplaying the seriousness of officer or detective misconduct including sexual assault, thereby acquiescing to an environment where sexual assault is accepted;
>
> (e) A custom, policy and practice of failing to appropriately identify victims or witnesses who are particularly vulnerable to advances by a known bad actor like Detective Suchinsky;
>
> (f) A custom, policy and practice of failing to adequately, properly, and timely respond to victims or witnesses who report being sexually groomed, assaulted, or harassed by officers or investigators on their case;
>
> (g) A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via use of governmental phones and emails for personal reasons and/or without proper supervision; and
>
> (h) A custom, policy and practice of allowing officers and/or detective to contact victims or witnesses via personal text message, phone calls, emails for reasons unrelated to job functions.

(*Id.* at ¶ 181.)  The City challenges this list, arguing that "the existence of such policies, practices, or customs are not factually supported by the averments in the Amended Complaint," and that these "conclusory allegations of the existence of such policies or practices . . . should be disregarded."  (Doc. No. 13 at 13.)  The Court disagrees.

The Amended Complaint identifies numerous examples of police officers who, like

former-Detective Suchinsky, "groomed and sexually assaulted" individuals involved in their

investigations or over whom they had positions of power.  (*See* Doc. No. 10 at ¶ 104; *see also*

Doc. No. 16 at 25.)  Of note, Plaintiff identifies "Detective Philip Nordo" and alleges that he

"was arrested in 2017 . . . and convicted in 2022 on charges of rape, sexual assault, indecent

assault, official oppression, stalking, and other offenses related to sexually assaultive and

coercive behavior directed to male suspects, witnesses, informants, and individuals who were

otherwise involved in his investigations dating back to at least 2012."  (Doc. No. 10 at ¶ 105.)

"Similarly, last year, retired Philadelphia police officer Patrick Heron was arrested for unlawful

sexual contact with minors, as well as *witness retaliation, harassment, and stalking* of adults and

juveniles to cover up his official misconduct."  (*Id.* at ¶ 106 (suggesting that Heron's conduct

occurred at least until he retired from the Department in 2019).)  Finally, we highlight Plaintiff's

allegation that "in 2019, former PPD inspector Carl Holmes, Jr. was charged with assaulting

three female officers after a grand jury concluded he abused his power as a police academy

instructor/mentor."  (*Id.* at ¶ 122.)[6]

The City takes issue with many of Plaintiffs' examples, arguing that each officers'

subsequent arrest shows that, contrary to Plaintiffs' allegations, the City *did* properly address the

---

[6] Plaintiff also identifies numerous other PPD employees who committed crimes of a sexual nature.  (Doc. No. 10 at ¶¶ 109, 112, 114, 115, 116, 118.)  Here, however, the Court focuses on misconduct that occurred in the five years before the harassment and assault suffered by Plaintiff in 2019. *See Watson v. Abington Township*, 478 F.3d 144, 156 (3d Cir. 2007) ("Assuming that this evidence, viewed in the light most favorable to the Plaintiffs, raises a genuine issue of material fact as to the Department's practices regarding racial profiling, the problem facing these Plaintiffs is that any evidence of a policy or custom ends in 1993—five years before the first instance of misconduct alleged in this case."); *see also Couler v. City of Gary*, 2023 WL 3052252, at*3 (N.D. Ind. Apr. 24, 2023) (noting that "courts throughout the Seventh Circuit routinely order the production of all files for a five-year period preceding the event at issue in a case in cases involving *Monell* discovery requests" (quotation marks omitted) (collecting cases)).  The Court also looks only to examples of PPD employees using their positions of power to further their crimes—sexually assaulting victims and witness or committing crimes while on-duty.  *See id.* at 157 ("Our cases under *Monell* have typically involved an alleged constitutional violation that was an actual occurrence of the specific alleged custom.").

sexual misconduct, and thus, could not have cultivated a culture that allowed such conduct. (Doc. No. 13 at 15–16.)  But this argument disregards Plaintiff's other allegations.  Notably, Plaintiff alleges that although Detective Nordo was arrested in 2017, the Philadelphia District Attorney's Office conceded that it knew about his "sexual misconduct as early as 2005" but did nothing to stop him.  (*Id.* at ¶ 107.)  Similarly, Plaintiff alleges that although the City dismissed one officer from the PPD in 2007 after he assaulted a female witness, the City hired him to work in the Sheriff's Office in October 2021.  (*Id.* at ¶ 110.)  Finally, Plaintiff alleges that in addition to these "publicly reported instances of [PPD] officers who have engaged in sexual misconduct, there are numerous instances which have been concealed form the public, investigated internally by the City and/or Internal Affairs, and/or resolved confidentially," further signifying the "laissez-faire approach to oversight and discipline of officers in the [PPD] who have engaged in sexual misconduct."  (*Id.* at ¶ 123.)

In addition to examples of sexual misconduct by other police officers, Plaintiff also plausibly alleges that she is not Suchinsky's only victim.  As stated above, according to the Amended Complaint, Assistant District Attorney Lyandra Retacco publicly commented that "Detective Suchinsky likely victimized other women," and ADA Retacco "told Plaintiff that there is another victim of Detective Suchinsky's conduct known to the [District Attorney's Office]."  (*Id.* at ¶¶ 16–18; *see also id.* ¶ 19 (alleging that the District Attorney's Office "previously disclosed to criminal defendants the general nature of Detective Suchinsky's prior misconduct as part of the criminal discovery process").)

Taking these allegations as true and viewing them in the light most favorable to Plaintiff, as we must at this stage, the Court finds Plaintiff's allegations sufficiently state a claim for municipal liability based on an unconstitutional custom.  Given the similar nature of other

officers' misconduct and the allegation that Suchinsky used his position of power to sexually exploit at least one other woman, the Court finds that Plaintiff has plausibly alleged "an influx of police sexual misconduct . . . to which the City has f[allen] woefully short of responding in an appropriate manner, thereby communicating a message of deliberate indifference and tacit approval."  (Doc. No. 10 at ¶ 103.)  *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."); *Gorman v. Warwick Twp.*, Civil Action No. 10–CV–6760, 2011 WL 1235198, at *6 (E.D. Pa. Apr. 1, 2011) ("While proof of a single incident of unconstitutional activity may not be sufficient, in and of itself, to establish liability under *Monell*, if a municipal entity can be shown to have tolerated known misconduct by police officers in the past or that its policymakers were aware of similar unlawful conduct in the past but failed to take precautions against future violations and that this failure at least in part caused the injury complained of, it may be liable."); *Leighliter*, 2018 WL 6812496, at *7 ("Alternatively, the [second amended complaint] details that, by the summer of 2014, the culture within the Connellsville Police Department was such that [the plaintiff, a minor's,] 'open and notorious presence' was tolerated throughout the police facilities, including alone in Reese's office, with knowledge that Reese was having inappropriate sexual contact with her.  Indeed, Plaintiff avers that this sexual misconduct was a 'open joke' in the Connellsville Police Department.  These allegations, if proven, are sufficient to constitute a custom of tolerating or acquiescing to unlawful misconduct with respect to police interaction with juvenile, female informants."); *cf. Johnson v. City of Paterson*, No. 21cv19907 (EP) (JSA), 2022 WL 16570649, at *4–5 (D.N.J. Nov. 1, 2022)

(finding that the plaintiff "sufficiently pleaded a claim for an unconstitutional custom" where she "specifically alleged that Officer Qirjak swung her into a wall and bench while she was in handcuffs at the police station," that "several officers witnessed the incident and refused to intervene," and that the police department's internal affairs division found an officer acted wrongfully in one of the 93 excessive force complaints filed with the City between 2015 and 2019).

The City's motion to dismiss Count II is denied.

## 2.    Failure to Train

In Count III, Plaintiff's municipal liability claim is premised on a failure to train. Under this theory, a plaintiff must show that the municipality's "failure amounts to deliberate indifference to the rights of persons with whom . . . employees will come into contact." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quotation marks omitted). In addition, the plaintiff must allege facts from which the court can infer that "the deficiency in training . . . actually caused the constitutional violation." *Id.* (cleaned up).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 223. Typically, "'a pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). A pattern of prior violations places "municipal decisionmakers on notice that a new [training] program is necessary," and suggests that their continued adherence to an inadequate program amounts to a "conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). If a plaintiff is unable to show a pattern of prior violations, his failure to train claim survives only if the need for training "can be

30

said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *see also Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409 (describing *City of Canton* as "hypothesiz[ing] that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and that the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice"); *Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) ("A pattern of similar constitutional violations is typically necessary to demonstrate deliberate indifference for purposes of failure to train. However, to establish deliberate indifference based on a single incident, a plaintiff must show that his injury was an 'obvious consequence' of the deficiency in the supervisor's training program.") (internal citations omitted).

As the City correctly notes, Plaintiff cannot base her failure to train claim on a theory that the City had to train its officers not to commit sexual assault.  (*See* Doc. No. 13 at 18 (collecting cases).)  Plaintiff does not contest this issue, likely because Count III of the Amended Complaint focuses on the Doe Defendants who oversaw Suchinsky and watched him interact with Plaintiff. She argues that had those individuals been trained to "identify and respond to the incidents of sexual grooming, assault, and harassment amongst the police force," Suchinsky would not have been able to assault and harass Plaintiff for the three months he was overseeing her son's murder investigation.  (*See* Doc. No. 10 at ¶ 186 (alleging that the City's "failure to train officers of the [Department] like Detective Suchinsky, Jim Doe Detective, Jen Doe Detective, and/or John Doe

Supervisors 1–5 amounted to a deliberate indifference to the rights of individuals who came into contact with [Suchinsky] in the course of investigations performed by him, like the one into the murder of Plaintiff's son"); *see also id.* at ¶¶ 188–89 (reasoning that given the "history of sexual assaults by PPD officers before November 2020, . . . it was obvious the City needed to implement a more robust, rigorous, and different program for training and supervising" its "police officers, detectives, and/or agents" as well as its "ranking officers and supervisors" to train officers on how to "appropriately identify and respond to the incidents of sexual grooming, assault, and harassment amongst the police force," and to train supervisors on how to "deter and prevent subordinate officers from ignoring warning signs of abuses of power").)

The City does not address the allegations related to improper training of the Doe Defendants in its motion or response brief.  Accordingly, the Court denies the motion to dismiss Count III to the extent that count alleges a failure to train officers to recognize and respond to sexual misconduct by fellow PPD employees.

## IV.      CONCLUSION

In short, many of the City's arguments are premature; they are better addressed after discovery at the summary judgment stage.  For that reason and the reasons discussed above, the City's motion to dismiss is denied.  An appropriate order follows.